(No. 59879

EDWARD SIMMONS, Appellee, v. UNION ELECTRIC COMPANY, Appellee (Sachs Electric Company, Appellant).

*Opinion filed November 30, 1984.*

446

448

Bruegge & Becker, of Breese (William J. Becker, of counsel), for appellant.

Amiel Cueto, of Cueto & Moore, Ltd., of Belleville, for appellee Edward Simmons.

Pope & Driemeyer, of Belleville (Karl D. Dexheimer and Thomas F. Hennessy III, of counsel), for appellee Union Electric Company.

JUSTICE SIMON delivered the opinion of the court:

We are called upon in this appeal to decide (1) whether the Structural Work Act (Ill. Rev. Stat. 1981, ch. 48, par. 60 *et seq.*) applies to the plaintiff's claims against the defendant, (2) whether the principles of comparative fault are applicable to the plaintiff, a workman who brought a claim under the Structural Work Act (the Act), in view of this court's decision in *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, a question left unresolved by our decision in *Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 17, and (3) whether the defendant is entitled to indemnity from a third-party defendant.

The plaintiff, Edward Simmons, sought recovery against the defendant, Union Electric Company (Union Electric), in the circuit court of St. Clair County for injuries he received while working as an electrical repairman for Sachs Electric Company (Sachs) at Union Electric's power plant in Cahokia, Illinois, a plant which had been shut down. Union Electric had no personnel in this plant except for employees who inspected the property from time to time. Sachs had entered into contracts with Union Electric to install and maintain electrical power to

the Cahokia plant. Simmons and another Sachs' employee (since deceased) were sent to the Cahokia plant by Sachs, at the request of Union Electric, because of flooded conditions at the plant. After arriving at the plant, they discovered that a sump pump had become inoperative, resulting in flood waters remaining in an ash pit in which the pump was housed. Simmons, while descending into the ash pit on a permanently affixed ladder which had become covered with oil from the flood waters, slipped, fell into the ash pit, and sustained injuries.

Oil on the ladder was apparently not unusual at the Cahokia plant. Previous flooding at the plant had left a similar residue which had, at least on one occasion, required Union Electric to hire an outside contractor to clean the oily surfaces. Evidence submitted at trial also establishes that Sachs had knowledge of the oily conditions in the plant after previous flooding had occurred. According to the terms of its contract with Union Electric, Sachs was responsible for "all appropriate safety precautions necessary or advisable for the prevention of accidents" when Sachs' employees were working at the Cahokia site.

Union Electric filed a third-party complaint against Sachs seeking either contractual or common law indemnity. In the alternative, Union Electric sought contribution from Sachs, which in turn filed a counterclaim against Simmons seeking indemnity or contribution, other than the contribution provided for by section 5(b) of the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.5(b)).

After a bench trial, the circuit judge, without explanation, entered judgments under the Structural Work Act for plaintiff in the amount of $219,000 against Union Electric and in favor of Sachs on Union Electric's third-party complaint. The appellate court affirmed

plaintiff's judgment against Union Electric, but it reversed the judgment in favor of Sachs on Union Electric's complaint for indemnity and entered judgment in favor of Union Electric (121 Ill. App. 3d 743). The appellate court also held for Simmons on Sachs' counterclaim for contribution or indemnity. We granted Sachs' petition for leave to appeal (87 Ill. 2d R. 315(a)) and resolve questions not originally contained in that petition, but briefed and argued by another party, pursuant to our power to resolve issues warranted by the record (87 Ill. 2d R. 318(a)).

## I. APPLICATION OF THE STRUCTURAL WORK ACT TO UNION ELECTRIC

Union Electric first argues that the Act was improperly invoked. Section 9 of the Act provides:

> "Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act, shall comply with all the terms thereof ***.
>
> * * *
>
> For any injury to person or property, occasioned by any wilful violations of this Act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured ***." (Ill. Rev. Stat. 1981, ch. 48, par. 69.)

Union Electric contends that it did not "have charge of" the plaintiff's work, the work performed was not on a "structure" and no "wilful" violation occurred, and therefore both the circuit and appellate courts erred when they held that Union Electric had violated the Act.

To hold a party accountable under the Act, the court must find that the party had charge of the work in question. Union Electric contends that it had no direct connection with the repair operations and, relying on

*McGovern v. Standish* (1976), 65 Ill. 2d 54, it argues that the totality of circumstances in this case is insufficient to find that it had control of the plaintiff's work.

The term "having charge of" "is primarily a factual question." (*McGovern v. Standish* (1976), 65 Ill. 2d 54, 66; see also *Voss v. Kingdon & Naven, Inc.* (1975), 60 Ill. 2d 520, 525.) The factual inquiry involves numerous factors, including those enunciated in *Chance v. City of Collinsville* (1983), 112 Ill. App. 3d 6, 11. The fact that all work performed by Sachs was "subject to inspection and final acceptance" by Union Electric, that Union Electric employees visited the plant regularly while the plant was closed, and that Sachs' employees only entered the Cahokia plant at the request of Union Electric supports the determinations of the circuit and appellate courts that, for the purposes of the Act, Union Electric was one of the parties in charge of the work at the time of the accident. *Norton v. Wilbur Waggoner Equipment Rental and Excavating Co.* (1979), 76 Ill. 2d 481, 490-91.

Union Electric next argues that the plaintiff was not injured while working on a "structure." It emphasizes that at the time he was injured Simmons was attempting to reach a temporary sump pump. Union Electric concludes that a "structure" was not under repair and that the Act therefore did not apply.

The circuit and appellate courts correctly determined that Simmons was working on a "structure" at the time of the injury. *Navlyt v. Kalinich* (1972), 53 Ill. 2d 137, suggests the flexibility of the term "structure" as used in the Act. In that case, a trench was held to be a structure within the meaning of the Act. That trench was used to install sewer tiles for townhouses. In this case, the structure was the ash pit which housed the sump pumps Simmons was instructed to repair. In order to reach the pumps, Simmons descended on the ladder which, for the purposes of the Act, was a scaffold. Fol-

lowing this court's test in *Navlyt,* the ash pit where Simmons was injured was a " 'structure' under the Act, either considered by itself or as an integral part" of the repairs at the Cahokia plant. *Navlyt v. Kalinich* (1972), 53 Ill. 2d 137, 138-39.

Finally, Union Electric contends that any violation of the Act was not wilful. The appellate court correctly followed the applicable standard that a "wilful violation of the Act occurs when one having charge of the work knows that a dangerous condition exists on a support device or, by the exercise of reasonable care, could have discovered the existence of the condition. [Citation.]" (121 Ill. App. 3d 743, 754; see also *Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 501-02.) The conclusion that Union Electric knew or should have known that the ladder on which Simmons slipped was unsafe at the time of his injury because it was covered with an oily substance was not against the manifest weight of the evidence. The evidence that Union Electric knew that the waters which flooded the Cahokia plant were oily, and could leave an oily substance on the ladder leading to the ash pit, was sufficient to justify the conclusion that Union Electric wilfully violated the statute.

## II. APPLICATION OF THE ACTIVE INDEMNITY THEORY TO SACHS

The circuit and appellate courts having correctly determined that Simmons' injuries resulted from a violation of the Act by Union Electric, the next inquiry is whether, as the appellate court in reversing the circuit court held, Sachs was required to indemnify Union Electric on the theory that Sachs was actively negligent. Whether the Contribution Act (Ill. Rev. Stat. 1981, ch. 70, par. 301 *et seq.*) has rendered obsolete the common law doctrine of active-passive indemnification has been posed by this court and suggested by learned commenta-

tors. (See *Heinrich v. Peabody International Corp.* (1984), 99 Ill. 2d 344, 350; *Morizzo v. Laverdure* (1984), 127 Ill. App. 3d 767.) However, neither Union Electric nor Sachs has shown a willingness to raise and brief this question, and we therefore, as the appellate court did, apply the common law indemnity doctrine which requires a determination of which tortfeasor was actively negligent and which one was passively negligent.

This inquiry is not incompatible with our approval of the decision of the circuit court judge implicit in his entry of judgment against Union Electric—that Union Electric was in charge of the work for purposes of the Structural Work Act. *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 123, correctly points to the possibility of more than one person having charge of the work. (See also *Bloodsaw v. Corbetta Construction Co.* (1980), 86 Ill. App. 3d 52, 55.) Merely having charge of the work is not dispositive on the issue of which of two tortfeasors is actively negligent. Thus, Union Electric can be found to be both in charge of the work and passively negligent, entitling it to be indemnified by Sachs, if Sachs was the active wrongdoer.

The court explained the active-passive theory of indemnification in *Griffiths & Son Co. v. National Fireproofing Co.* (1923), 310 Ill. 331, 339, a Structural Work Act case, when it stated: "[W]here one does the act which produces the injury and the other does not join in the act but is thereby exposed to liability and suffers damage the latter may recover against the principal delinquent, and the law will inquire into the real delinquency and place the ultimate liability upon him whose fault was the primary cause of the injury. [Citations.]" This test was reaffirmed and clarified in *Miller v. DeWitt* (1967), 37 Ill. 2d 273, also a Structural Work Act case, which taught that a qualitative difference must ex-

ist between the actions of the active and passive tort-feasor. To find Sachs an active party at fault, the facts must reveal its responsibility was qualitatively different than Union Electric's violation of the Act.

Sachs points to the duties the appellate court concluded each had to the plaintiff and argues that Union Electric had the primary responsibility for removing the oil from the premises and cleaning up debris. It claims, therefore, that the provisions of the contract between Union Electric and Sachs which required the latter to "take all appropriate safety precautions necessary or advisable for the prevention of accidents" were insufficient to shift the entire responsibility of the accident onto it.

In *Miller*, this court noted that a finding of having charge of the work for purposes of the Act "does not mean that persons found liable thereunder are necessarily active wrongdoers." (*Miller v. DeWitt* (1967), 37 Ill. 2d 273, 291.) Just as in *Miller*, where architects were held to have a viable claim for indemnity against the injured workmen's employer who controlled the work site, Sachs was responsible for providing safety equipment such as boots, oil rags and ropes or netting to protect the plaintiff against unsafe conditions, including oily surfaces, as well as directing how he was to go about repairing the structure. Sachs was also responsible for providing lighting in the premises while repairs were being made and such additional manpower or materials as were required to safely make the repairs. Simmons testified that the lighting was not sufficient for him to see the oil on the ladder; he also testified that if he needed additional equipment or personnel to perform his mission, he would call upon Sachs and not Union Electric.

On the other hand, Union Electric's participation was limited to notifying Sachs that the plant needed repairs and inspecting those repairs after they were completed by Sachs. The maintenance contract was let by Union

Electric to Sachs because there were ordinarily no Union Electric employees at the plant and Union Electric needed someone who would be available for repairs to the electrical system. Sachs' actions, then, were active when compared to Union Electric's limited passive role. On the basis of the facts presented by the record, we are persuaded that the circuit court's conclusion that Sachs was not the active wrongdoer was contrary to the manifest weight of the evidence, and the appellate court's resolution of this issue was correct.

### III. COMPARATIVE NEGLIGENCE AND THE STRUCTURAL WORK ACT

Sachs requests that, if it is liable, this court apply the principles of comparative negligence to the conduct of Simmons in this Structural Work Act action. Inconsistent decisions have been reached on the applicability of comparative negligence to the conduct of a workman injured as a result of a faulty scaffold. (Compare *Schmidt v. First Bank Builders* (1984), *appeal granted,* No. 60644 (circuit court allowed inclusion of defense of comparative negligence in Structural Work Act Claim), with *Prewein v. Caterpillar Tractor Co.* (1984), 123 Ill. App. 3d 687, *appeal granted,* No. 60182 (holding that comparative negligence did not apply to the conduct of a workman's claim under the Structural Work Act).) Sachs argues that our recent holdings incorporating the principles of comparative negligence into the fabric of tort law (see *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1; *Alvis v. Ribar* (1981), 85 Ill. 2d 1; *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104; *Doyle v. Rhodes* (1984), 101 Ill. 2d 1) should be expanded to include an action under a safety statute.

*Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, was this court's first recent application of the doctrine of contribution. That case, in

which there was a claim of strict liability, applied the theory of comparative fault as a basis for contribution as between two defendants who were equally unintentionally responsible for the plaintiff's injury. The court in *Skinner* reasoned that it was inequitable to place the entire burden of the loss on a single defendant when another defendant was also at fault.

This equitable doctrine was expanded in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, this court's next major decision in this tort area. The holding that comparative negligence should be applied in place of contributory negligence was premised on the inequitable results in negligence actions where contributory negligence was available as a defense and a minor amount of fault on the part of the plaintiff doomed his otherwise worthy claim. The *Alvis* decision pointed out that contributory negligence was a court-promulgated doctrine and therefore the court could replace it with comparative negligence.

*Alvis* was followed by *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, which extended comparative negligence by applying it to strict liability actions. This was also a change in a *judicially* created doctrine and was adopted because "application of comparative fault principles in strict products liability actions would not frustrate this court's fundamental reasons for adopting strict products liability ***." (*Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 116.) Sachs contends that here, as in *Coney,* applying comparative negligence would not frustrate the fundamental reasons for the legislature's determination that contributory negligence, a defense in other negligence actions at the time the Act was adopted, would not be available to a defendant in actions under the Act.

Our most recent decision applying the principles of comparative negligence, *Doyle v. Rhodes* (1984), 101 Ill.

2d 1, held that the Contribution Among Joint Tort-feasors Act (Ill. Rev. Stat. 1981, ch. 70, par. 301 *et seq.*) was intended to codify our decision in *Skinner*, allowing for comparisons between joint tortfeasors. This application of the Contribution Act, Sachs argues, requires us to extend comparative negligence to safety statutes because it allows comparative negligence between joint tortfeasors in a statutory context.

Sachs overlooks, however, that in *Doyle* comparative negligence was applied, as between the employer of the injured party and a third party whose automobile struck the injured party, to determine the extent to which each contributed to the injury. It did not apply to negligence, if any, on the part of the injured plaintiff. Consequently, in *Doyle,* we noted, fully aware of the trend already established in this area, that "we venture no opinion here as to whether a defendant whose liability arises from a safety statute may be excused from paying damages to the extent that the injured plaintiff, rather than a third-party tortfeasor, was concurrently negligent." (*Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 17.) The question we are now required to answer, whether the principles of comparative negligence apply to the conduct of the plaintiff whose claim arises under a safety statute, calls for an examination of the policies of the Act and our decisions concerning safety statutes.

We first look to our opinion in *Vegich v. McDougal Hartmann Co.* (1981), 84 Ill. 2d 461, which involved another safety statute, the Road Construction Injuries Act (Ill. Rev. Stat. 1979, ch. 121, par. 314.1 *et seq.*), and required us to determine whether contributory negligence was a defense to claims brought under that statute. In holding that it was not, we noted that the legislature's use of the wilfullness standard of liability indicated an intention to foreclose the use of contributory negligence. We observed that this type of legislation "fixes a broad

and distinct exception from the general rule" of contributory negligence. (*Vegich v. McDougal Hartmann Co.* (1981), 84 Ill. 2d 461, 466, citing *Carterville Coal Co. v. Abbott* (1899), 181 Ill. 495, 503.) Because the Act continues to present an exception to the presently prevailing common law principle that an injured person seeking recovery should be penalized to the extent of his own negligence, we hold that comparative negligence does not apply to the conduct of a workman who is eligible to rely upon the Act. Instead, the sole inquiry under the Act is an assessment of the defendant's culpability and not the plaintiff's conduct.

Treating claims under the Act differently from common law actions does not conflict with our previous holdings which first allowed and then expanded the use of comparative negligence. "It has been determined that the Structural Work Act protects work activities of a particularly hazardous nature and is designed to lessen the extent of the danger. [Citations.] *** To effectuate this purpose a liberal construction has been adopted [citation] in order to afford 'broad protection to working men.' [Citation.]" (*Halberstadt v. Harris Trust & Savings Bank* (1973), 55 Ill. 2d 121, 127.) This statute is dissimilar to a common law remedy designed to compensate an injured party for the damage he has suffered because of the negligence of another and even to the protection afforded under the common law products liability doctrine, which is designed to compensate consumers injured by unsafe products. The purpose of this safety statute, like the one involved in *Vegich,* "is to prevent accidents before they occur; failing that, to compensate those injured by extrahazardous but socially useful activities." (*Vegich v. McDougal Hartmann Co.* (1981), 84 Ill. 2d 461, 467; see also *Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 498.) "[I]t is apparent that the act was intended to remove fault of the employee as a

defense and place full responsibility on the 'person in charge' who knowingly violated the act." (*Bryntesen v. Carroll Construction Co.* (1963), 27 Ill. 2d 566, 569.) Applying comparative negligence would be inconsistent with the legislature's intent, which was to provide full compensation for their injuries for workmen covered by the Act.

In *Vegich* we advanced the idea that a person injured as the result of the violation of a safety statute was entitled to have his injuries *fully* compensated.

> "When the statutory purpose of prevention is frustrated by a wilful violation and an accident follows, the *full burden of the loss must be laid on the wrongdoer, even if the victim was himself negligent.* The Road Construction Injuries Act is no exception. As one commentator has put it, '[T]he dominant legislative purpose of the Construction Injury Act is to *protect and fully compensate persons injured by its violation.*' Sinder, *Chapter 121, Section 314.1 et seq.: Another Scaffold Act???* (1971), 59 Ill. Bar J. 842, 843." (Emphasis added.) (*Vegich v. McDougal Hartmann Co.* (1981), 84 Ill. 2d 461, 467.)

The explanation for our conclusion in *Vegich* that contributory negligence was not applicable in the case of a safety statute is equally relevant to our conclusion here that comparative negligence is also inapplicable. Applying comparative negligence might result in a party injured by a violation of the Act being less than *fully* compensated for his injuries.

Application of comparative negligence to the plaintiff's action conflicts with our established rules of statutory construction. In *Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 317, the court noted that "we must apply the legal axiom that the words of a statute should be construed to give effect to the legislative intention, which must be ascertained not only from the language of the entire act, but from

the evil to be remedied and the object to be attained." The Act, first passed as an exception to the common law, can only continue to remedy the evil envisioned by the legislature by excluding any consideration of the plaintiff's alleged fault. Otherwise, the Act would be indistinguishable from a common law construction negligence action. Comparative negligence must be disregarded so as to conform with the legislature's intent which was to afford complete protection for construction workers.

Sachs also argues that it is entitled to implied indemnity or contribution from the plaintiff. Just as the plaintiff under the Act is not penalized for his own negligence, the statute also precludes any liability which might otherwise be passed on to him through an indemnity or contribution claim. To hold otherwise would conflict with the conclusion we reach on the use of comparative negligence and with the intent of the legislature when it passed the Structural Work Act. *Cf. Flora v. Home Federal Savings & Loan Association* (7th Cir. 1982), 685 F.2d 209 (upholding the district court's denial of an injured workman's motion to strike the defendant's counterclaim for indemnification against him because he was the sole owner of the employer corporation, but noting that the Act provided protection for a plaintiff injured while working for a separate legal entity).

Likewise, Sachs calls attention to the provision of the Act which makes "[a]ny owner, contractor, sub-contractor, *foreman* or other person" liable for injuries to workmen. (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 48, par. 69.) It argues that because foremen are specifically listed as parties liable for violations of the Act, Simmons, who was a foreman, is subject to being held accountable to Sachs under an indemnity theory. However, this construction would conflict with our analysis of the Act and its underlying purpose, which is the protection of work-

ers, regardless of their title, engaged in hazardous activities which benefit society. As we read the Act, the use of the word "foreman" does not include a foreman when he, himself, is the injured workman.

Union Electric also contends that the damage award of $219,000 to Simmons was excessive in light of the evidence presented to the circuit court. However, Sachs, the third-party appellant which will be required to satisfy the judgment, has not raised this issue either in its petition for leave to appeal or in its briefs. We therefore see no reason for considering it.

### IV. ALLEGED BIAS AND PREJUDICE
### OF THE CIRCUIT JUDGE

Finally, Sachs argues that the circuit judge was involved, at or shortly prior to trial in this case, in a utility bill dispute with Union Electric concerning service to the judge's residence. Sachs contends that the circuit judge should have recused himself and that the appellate court erred when it refused permission to amend the record to incorporate the details of this dispute after Union Electric presented a motion to so amend in the appellate court. The appellate court concluded that Union Electric had knowledge of the dispute during the trial but remained silent about it, and that this precluded Union Electric from suggesting that the circuit judge was biased and prejudiced against it for the first time at the appellate level. Consequently, it denied Union Electric leave to amend the record.

The appellate court, however, never addressed the effect of such a ruling on Sachs, which claims it knew nothing of any dispute between the circuit judge and Union Electric until the latter sought to file affidavits in the appellate court revealing it. Sachs now contends that it is affected by any bias and prejudice against Union Electric which may have influenced the award against

that defendant. The reason is that, as a result of the appellate court decision, Sachs is required to satisfy that award in full.

This court, like the appellate court, is not a fact-finding tribunal. Because of the nature of a reviewing court, we conclude that the appellate court correctly refused amendment of the record because to do so would have engaged it in a fact-finding proceeding. However, if Sachs desires to do so, it can raise the issue in the circuit court when the mandate is issued in this case and attempts are made to enforce the final judgment of the circuit court.

For the reasons given, the judgment of the appellate court is affirmed.

*Judgment affirmed.*