EDWARD T. RAMBERT, Plaintiff-Appellant, v. ADVANCE CONSTRUCTION COMPANY, INC., *et al.*, Defendants-Appellees (Advance Management Corporation *et al.*, Defendants).

First District (2nd Division)   No. 84—1306

Opinion filed May 28, 1985.—Rehearing denied June 20, 1985.

Arthur S. Gomberg and Sheldon S. Gomberg, both of Chicago (Robert L. Caplan, of counsel), for appellant.

McKenna, Storer, Rowe, White & Farrug, of Chicago (Robert S. Soderstrom, James P. DeNardo, and Gary S. Schafersman, of counsel), for appellees.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Plaintiff's first amended complaint alleged violations of the Structural Work Act (the Act) and his second amended complaint sounded in negligence. Defendants Advance Construction Company, Inc., Herbert Portes, as trustee under Barbara L. Carson Children's Trust No. 2, and Demax Construction Company, Inc., filed motions for summary judgment against plaintiff based on the inapplicability of the Act to plaintiff's injury. Herbert Portes filed a separate motion for summary judgment against plaintiff on the basis that he was not "in charge of" the work as required by the Act. The trial court ultimately treated the amended complaints as one pleading, with the first amended complaint comprising count I and the second amended complaint comprising count II. On March 23, 1984, the trial court granted summary judgment in favor of Advance Construction, Herbert Portes, and Demax Construction and against plaintiff on count I. Herbert Portes' separate motion for summary judgment was denied. On April 30, 1984, the trial court made the March 23 summary judgment order appealable.

The legal title to the property on which this accident occurred is held by Herbert Portes as the trustee under the Children's Trust No. 2. Defendant Advance Construction leased the property from Portes, and defendant Demax Construction was acting as the general contractor for the construction of a heliport on the site. Plaintiff was employed by Professional Construction Company, a subcontractor hired by Demax

and a third-party defendant to this action.

On March 26, 1979, plaintiff was performing construction work on the site. Plaintiff and another worker were installing external siding on the east wall of the heliport. The plaintiff was working on the ground and could install all the siding from the ground. Plaintiff and his partner had walked over to pick up a piece of corrugated steel to bring back to install. Plaintiff and his partner picked up the piece of steel siding and, with plaintiff walking backwards, made their way to the point of the wall where the siding was to be installed. As they were walking, plaintiff's partner told plaintiff that they would need the pair of vice-grips lying on the ground to plaintiff's right. Plaintiff held the siding with his left hand, bent down and picked up the tool, regripped the siding and continued walking backwards toward the point of installation, which was now very close. As plaintiff began to start walking backwards again, he stepped into a 55-gallon drum with his left leg. The drum had been buried in the ground with the rim flush with the surface on the ground. The drum was to be later filled with concrete for the installation of a post and was very near to the area where plaintiff was working. Approximately 20 minutes before the accident, there had been a covering over the hole created by the buried drum. The hole was very near or in the path that plaintiff and his partner had been following when they went to retrieve other steel panels, and was approximately one foot from the wall where the next piece of siding was to be installed.

Plaintiff brought this action against the various defendants under the Act. (Ill. Rev. Stat. 1979, ch. 48, par. 60 *et seq.*) The defendants' motions for summary judgment were based upon the theory that, because the facts alleged that plaintiff was working on the ground and fell into a hole in the ground, that no action could lie under the Act. Plaintiff contended that the failure to have a support over the hole was actionable under the Act. Upon the granting of summary judgment in favor of defendants, plaintiff filed this appeal pursuant to Supreme Court Rule 304(a) (87 Ill. 2d R. 304(a)). The sole issue for review is whether the failure to provide a cover over the 55-gallon drum in the ground is actionable under the Act.

Upon review of the trial court's entry of summary judgment, this court must determine whether the lower court was correct in ruling that no genuine issue of material fact was raised and, if none was raised, whether entry of the judgment was correct as a matter of law. (*Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 938, 453 N.E.2d 1133.) Summary judgment "is to be granted only where the evidence, when construed most strongly against the moving party, establishes clearly

and without doubt his right thereto." *Motz v. Central National Bank* (1983), 119 Ill. App. 3d 601, 605, 456 N.E.2d 958.

■■ Generally, the Act "protects work activities of a particularly hazardous nature and is designed to lessen the extent of the danger." (*Halberstadt v. Harris Trust & Savings Bank* (1973), 55 Ill. 2d 121, 127, 302 N.E.2d 64.) The Act is liberally construed in order to help achieve its goal of protecting those persons engaged in such extrahazardous occupations. (*McNellis v. Combustion Engineering, Inc.* (1974), 58 Ill. 2d 146, 151, 317 N.E.2d 573.) However, the scope of the Act should not be expanded through strained or unnatural interpretations, especially when the injured party has recourse to his normal workers' compensation and tort remedies. (*Matthews v. Commonwealth Edison Co.* (1980), 90 Ill. App. 3d 1024, 1028, 414 N.E.2d 147.) The Act was never intended to cover all construction activities or all injuries at and around construction sites. (*Urman v. Walter* (1981), 101 Ill. App. 3d 1085, 1090, 428 N.E.2d 1051.) A commentator has noted that any extension of the Act must be warranted by compulsions and economic interests requiring the extension of legislative privilege in the form of a prohibition of a contributory negligence defense. (Marcus, *How Big an Umbrella? The Illinois Structural Work Act's Extent of Coverage*, 53 Chi. Bar Rec. 149, 157 (1972).) Concern over expanding the scope of the Act is also fueled by the recent case of *Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444, 473 N.E.2d 946, where our supreme court held "that comparative negligence does not apply to the conduct of a workman who is eligible to rely upon the Act." 104 Ill. 2d 444, 459.

The importance to an injured person of having his claim brought under the Act is obvious, given the fact that the sole inquiry under the Act is an examination of the defendant's culpability; the plaintiff's own conduct is, essentially, irrelevant. Unfortunately, the line of demarcation between injuries and activities covered by the Act and those that are not is dull at best. In the present case, in order to determine whether defendants failed to provide a proper support over the hole created by the buried 55-gallon drum, the seminal question becomes whether a plank or board laid over that hole would be properly classified as a "support" for purposes of the Act. For the following reasons, we believe that any such board or plank laid over the hole would properly be classified as a "support" and that the entry of summary judgment against plaintiff was improper.

In *Louis v. Barenfanger* (1968), 39 Ill. 2d 445, 236 N.E.2d 724, the supreme court held that the failure to provide scaffolding or supports when needed is actionable under the Act. (39 Ill. 2d 445, 449.) The concerned parties cannot avoid the operation of the Act by closing their

eyes to unsafe conditions at or near the construction site. *Kennerly v. Shell Oil Co.* (1958), 13 Ill. 2d 431, 439, 150 N.E.2d 134.

The principal case in support of plaintiff's position is *Ashley v. Osman & Associates, Inc.* (1983), 114 Ill. App. 3d 293, 448 N.E.2d 1011. In *Ashley*, the ground around a construction site was extremely muddy and, to prevent workers from sinking into the mud as they walked to the building, planks were laid out as walkways. While the plaintiff was walking on one of the planks, it slipped out and caused him to fall. The *Ashley* court held that the planks and forms used as a temporary walkway were supports within the meaning of the Act. (114 Ill. App. 3d 293, 298.) The court went on to state:

> "It is undisputed that the construction site was ungraded, wet and covered in mud so deep that plaintiff, at one time, sunk up to the top of his hip boots. Plaintiff's accident itself further illustrates the severity of the slippery conditions. Thus, it is our opinion that as a result of the unusually muddy conditions, planks and concrete forms were erected as supports specifically intended to prevent the workmen and their materials from sinking into the mud. In so finding, we emphasize that our decision is premised on the particular ground conditions which existed at the time of plaintiff's injury." 114 Ill. App. 3d 293, 298.

In reaching its determination, the *Ashley* court used a three-prong analysis, first looking at the intended use of the planks at the time of the injury. The court found it important that the planks were intended to keep the workers and their materials from sinking into the mud. The court then determined whether there was a connection between the injury and the hazardous nature of the supports. Recognizing that there is nothing inherently hazardous about planks placed on the ground, the court went on to state that the planks became hazardous when placed, unsecured, on the ungraded and slippery mud. Since the plaintiff was injured when a plank slipped in the mud, the connection criteria was satisfied. The final criteria focused on whether the danger involved was intended to be covered by the Act. Finding that it was, the court noted that the plaintiff's task of carrying materials was integrally related to his duties as a roofer. Consequently, the danger present from the unsecured planks on the ground was covered by the Act.

We find *Ashley* applicable to the present situation. In this case, as in *Ashley*, there was a peculiar ground condition that warranted a plank or board to act as a temporary cover should a worker stand or walk over the hole. Logically, a plank or board over an artificially created hole in the ground is analogous to the planks and forms placed on

top of the deep mud naturally resulting in *Ashley*. In both cases, the planks act as supports for the workers to walk or stand on to avoid the conditions below. Using the three-prong test outlined in *Ashley*, we are convinced that a plank or board covering the hole created by the buried drum should be treated as a "support" for purposes of the Act.

The first prong of the test focuses on the intended use of the device at the time of the injury. Defendants argue that the planks, if present, would only be intended as a safety feature; that they would not be intended for use as a working platform. Defendant concedes that a plank may in fact be stepped upon if a worker walked by, but argues that under *Tenenbaum v. City of Chicago* (1975), 60 Ill. 2d 363, 325 N.E.2d 607, neither the ground nor the floor are covered under the Act. While it is certainly true that the objective of placing a plank or board over the hole would be safety-oriented to keep individuals from falling into the hole, we note that in order to achieve that objective, any such plank would have to be sufficiently sturdy to bear the weight of an individual stepping on it. The planks would be placed for the specific purpose of preventing workers from falling into the hole if, during the course of their work, they should step in that spot. As such, the intended use of any planks here is consonant with the intended use of the planks in *Ashley*. We do not believe that merely because a worker here may only step on the plank inadvertently, a different result should be reached. Plaintiff was engaged in his trade and needed to step where he did at the time of the occurrence. That he did not need to step in that same spot for the entire day is of no consequence under these facts.

Our resolution of this first prong of the test is further supported by *Frick v. O'Hare-Chicago Corp.* (1966), 70 Ill. App. 2d 303, 217 N.E.2d 552. In *Frick* there was a 14-foot-deep excavated hole with a pole to be erected in the center. Cement forms were erected for the center pole, and plaintiff was required to perform a task on the top of the pole created by the cement forms. To reach that position, a 2 by 6 plank was extended from the edge of the unexcavated ground, over the 14-foot drop, to the top of the cement forms erected for the pole. The 2 by 6 plank was unsecured and, as plaintiff stood upon it over the excavation, it slipped, causing plaintiff to fall to the bottom of the excavation. The court held that the plank was a "support" under the Act because everyone used the plank as a support, plaintiff had to use it to do his work, and, in the absence of contrary evidence on remand, the plank was intended to be and was used as a support. (70 Ill. App. 2d 303, 309.) Given the size of the excavation in *Frick*, and the manner in which the plank was placed, it would be difficult to contend that it was not a "support" for purposes of the Act. The plank in *Frick* was the

practical equivalent of a scaffold. In this case, even though the hole in the ground is much smaller than that present in *Frick*, we find it logically impossible to satisfactorily differentiate between the intended use of the planks in both situations. In *Frick*, the plank was laid from the edge of the ground to the center of the hole and the worker walked out on it to perform some task. Here, the board would extend from one edge of the hole to the other and plaintiff would have stepped upon it as he carried materials to install. Moreover, the hole was so close to where plaintiff had to install the next piece of siding that it is both logical and reasonable to assume that plaintiff would need that area for footing to perform his task. Anyone who stepped on a plank here would have used it for support, if even for a brief moment. Though there were some references in the record to the effect that plaintiff could have taken an alternative route to his actual place of construction when carrying materials, we note again that plaintiff stated that the hole was only about 1 foot away from the actual point where he would have had to stand in order to install that last piece of siding. We cannot assume that plaintiff would stand completely motionless when working; therefore, any movement increases the chance that plaintiff or another could easily step into the hole. We do not believe that the difference in size between the hole in *Frick* and the hole here is of sufficient magnitude to distinguish *Frick*. A contrary ruling would render a plank over a 14-foot hole a "support" for purposes of the Act, but a plank over a 3-foot hole would not be so considered. Such an application of the Act is untenable. Consequently, under both *Ashley* and *Frick*, any plank over the hole created by the 55-gallon drum would be a "support" specifically intended to be a support by keeping workers from falling into the hole or through the plank.

The second prong of the inquiry focuses on whether the injury has some connection with the hazardous nature of the device in question. While *Ashley* recognized that there is nothing inherently hazardous about planks placed on the ground, those planks became hazardous because they were unanchored on the slippery, ungraded muddy surface. (*Ashley v. Osman & Associates, Inc.* (1983), 114 Ill. App. 3d 293, 298.) Any planks present here would be imbued with the hazardous possibility of a person falling through the plank into the hole below, similar to the hazard presented when a worker traverses a scaffold erected above ground. While the possibility of falling off a plank on the ground is rather remote when compared to falling off a scaffold, that remoteness does not vitiate the hazard of falling through. Moreover, plaintiff's cause of action is premised upon the failure to provide a support. The hazardous situation created by the absence of supports exceeds that

posed by weak or poorly designed supports under these facts. Because plaintiff was injured when he fell into the hole due to the absence of any barricade or any supporting device over the hole, it cannot be argued that there is no connection between his injury and the failure to provide planking.

The final prong of the inquiry is whether the danger involved was intended to be covered by the Act. As we stated above, the Act is designed to protect particularly hazardous work activities. It is unquestioned that plaintiff needed to carry the corrugated steel siding away from its stored location to the various points of the building where he was to install it. Plaintiff and his partner were installing the pieces of siding on the outside of the building in an end-to-end fashion, thus proceeding further along the wall upon the installation of each piece. The hole in the ground was located approximately 1 foot from the base of the wall where the next piece of siding was to be installed. It was when plaintiff and his partner were carrying the piece of siding and reached that point of installation that plaintiff stepped into the uncovered hole. Defendants maintain that plaintiff failed to show that he did not have any alternative open to him except to walk where he did. We agree with the principle that every place a worker chooses to stand does not become a scaffold or support for purposes of the Act. (See *Thon v. Johnson* (1961), 30 Ill. App. 2d 317, 322, 174 N.E.2d 400.) Here, however, the hole was very close to the location where plaintiff was to work and was a particularly hazardous condition by virtue of being uncovered. Moreover, plaintiff did not actually choose to stand there in a literal sense, given the fact that he was walking backwards when he fell. Any further inquiry into plaintiff's choice of steps and thoughts of alternative routes impinges upon the premise of *Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444, 473 N.E.2d 946, that "the sole inquiry under the Act is an assessment of the defendant's culpability and not the plaintiff's conduct." (104 Ill. 2d 444, 459.) We also find it especially important in this case that these were not merely holes created incidentally during the construction process by heavy vehicles or other contrivances moving over soft ground, or heavy equipment falling, or other construction devices causing ruts and depressions in the ground. These holes were not dug haphazardly, but rather, were located and dug according to some construction plan. The holes were dug for the purpose of placing a drum inside to act as a cement form for a post to be inserted later. For the foregoing reasons, we hold that the Act should cover the present situation.

The cases cited by defendant in support of its position are either distinguishable or unpersuasive. In *Thon v. Johnson* (1961), 30 Ill. App.

2d 317, 174 N.E.2d 400, a 4-foot-square hole, 6 to 8 feet deep, was left open after construction of a concrete garage floor. A cement form had been placed around the hole, into which concrete was to be poured; the bottom, however, had not been placed in the form. The plaintiff-electrician stood on the form which bridged the hole in the floor in order to reach a switch box located on the wall. The form came apart and the plaintiff fell through to the level below. The court held that the cement form was not a scaffold under the Act. In that case, however, the cement forms were never intended to be stood on, whereas here, any cover over the 55-gallon drum would be designed to support a person's weight.

Defendant also relies on *Tenenbaum v. City of Chicago* (1975), 60 Ill. 2d 363, 325 N.E.2d 607, *Quinn v. L.B.C., Inc.* (1981), 94 Ill. App. 3d 660, 418 N.E.2d 1011, *Choi v. Commonwealth Edison Co.* (1984), 129 Ill. App. 3d 878, 473 N.E.2d 385, and *Page v. Corley Cos.* (1985), 131 Ill. App. 3d 56. All of those cases, however, are sufficiently distinguishable from the present action. In *Tenenbaum*, the plaintiff was walking along a cement intermediate level floor. He tripped and fell against a ladder and then fell down through an unbarricaded opening. Our supreme court held that the floor was not a scaffold or support within the Act because it was being used as a floor. Also, there was nothing indicating the need for, or failure to provide, that plaintiff with a scaffold or platform for his work. (60 Ill. 2d 363, 370.) In *Quinn*, the plaintiff tripped over materials on the floor of a structure and argued that where he was walking was a scaffold or support. The court rejected this argument, stating that the floor was used as a floor, not a working platform. (94 Ill. App. 3d 660, 664.) To the same effect is the statement in *Choi:* "A floor is a floor and not a support device above a floor." (*Choi v. Commonwealth Edison Co.* (1984), 129 Ill. App. 3d 878, 881.) In *Page*, the plaintiff slipped and fell upon a Masonite sheet placed immediately on top of a terra-cotta floor. The court held that the sheets were not supports for purposes of the Act. The sheets were designed to protect the terra-cotta floor beneath; they were not designed as a working platform. Also, there was no hazard that anyone would fall off or through the sheets. At most, a worker could fall on the sheets, but that is not the sort of risk covered by the Act. *Page v. Corley Cos.* (1985), 131 Ill. App. 3d 56, 61.

In the present case, however, the plaintiff never argued that the ground was a support, thus being fatally analogous to the floors or Masonite sheets in the above cases. Rather, plaintiff only argued that there was a failure to provide a support. Also, given the proximity of the hole to plaintiff's actual point of work, it cannot be said that plain-

tiff would not have stood upon and over that hole in completing his task. The proximity of this hazard to the situs of plaintiff's work infers the need for and a failure to provide plaintiff with a platform on which to stand and complete his work if he were to step over the hole. Thus, we find the above cases distinguishable.

Nor do we find *Herman v. Swisher* (1983), 115 Ill. App. 3d 179, 450 N.E.2d 28, precedential. There, the foundation for a basement was finished, but no barricades or planks were present, thus leaving the large opening in the ground unprotected. Immediately prior to the accident, the plaintiff, a next-door neighbor, was standing near the edge of the hole by two individuals involved in installing a wooden joist. In an attempt by plaintiff to assist the individuals, he was bumped and fell into the open foundation. The plaintiff's claim under the Act was based on the "defendants' failure to provide planks, boards, guard rails or other barricades around the basement opening." (115 Ill. App. 3d 179, 180.) In affirming the dismissal of the plaintiff's claim under the Act, the appellate court stated:

> "The plaintiff was standing on the ground near the basement opening at the time the accident occurred. To so freely construe the Act as to include the ground within the definition of any of the devices named therein, would defeat the legislative intent inherent in the provision of a statutory remedy for injuries *** in connection with scaffolds or other supportive devices." (115 Ill. App. 3d 179, 181-82.)

Our reading of *Herman*, however, discloses that the court's analysis does not address the plaintiff's contention that his claim under the Act was based on a failure to provide a support or barricade where one was needed, namely, around the open foundation or across its expanse. Rather, the court analyzed whether the ground on which plaintiff stood could be considered a support, even though it does not appear that the plaintiff ever argued that proposition. We are hesitant to follow that type of reasoning. Moreover, we question whether the plaintiff in *Herman* could ever have been a proper plaintiff under the Act, given the fact that he was not a construction worker on the site, but was merely an onlooker trying to help. The opinion discloses that the plaintiff was a next-door neighbor to the fellow completing the construction, and that plaintiff, as he had done on several occasions, merely walked over to the defendant's house to observe the progress of defendant's construction project. (115 Ill. App. 3d 179, 180.) For all of the foregoing reasons, we believe the entry of summary judgment against plaintiff was improper.

In that the decision of the trial court is to be reversed, the denial of

defendant Herbert Portes' motion for summary judgment becomes important. His motion alleged that he was not "in charge of" the work site as required by the Act. Since the trial court in effect let the entire count under the Act fall by granting the other defendants' motions for summary judgment, we are unsure as to why it did not grant Portes' motion as well, based upon his uncontroverted affidavit. Upon reversal, Portes is now in a position of possibly facing liability under the Act. Consequently, in its brief on appeal, the defendant-appellee argues that the trial court incorrectly denied his motion for summary judgment. However, we do not believe this issue is properly before this court.

As a general rule, the denial of a motion for summary judgment is not an appealable order because the subsequent trial will cure any defect in the denial. (*Pleasure Driveway & Park District v. Kurek* (1975), 27 Ill. App. 3d 60, 67, 325 N.E.2d 650.) But, there are cases holding that where an appeal is otherwise properly before the appellate court from a final judgment, the court may review the denial of a motion for summary judgment. (See *Novak v. Insurance Administration Unlimited, Inc.* (1980), 91 Ill. App. 3d 148, 152, 414 N.E.2d 258; *Cedric Spring & Associates, Inc. v. N.E.I. Corp.* (1980), 81 Ill. App. 3d 1031, 1034, 402 N.E.2d 352; *Reznick v. Home Insurance Co.* (1977), 45 Ill. App. 3d 1058, 1059, 1063, 360 N.E.2d 461.) The procedural setting of those cases, however, made the review of the denied motion acceptable. In those cases, the denied motion belonged to the party taking the appeal from an otherwise final judgment, unlike the situation presented here. We can find no authority for the proposition that an appellee can, by way of responding to the other party's appeal, have its denied motion for summary judgment reviewed. Therefore, we refuse to review Portes' denied motion. We note that, upon remand, Portes would have an opportunity to renew his motion.

The entry of summary judgment in favor of defendants and against plaintiff or count I of his amended complaint is reversed and the cause remanded to the trial court.

Reversed and remanded.

HARTMAN and BILANDIC, JJ., concur.