JIMMY ROGERS, Plaintiff-Appellant, v. WEST CONSTRUCTION COMPANY, Defendant-Appellee and Third-Party Plaintiff (N.E. Finch Company, Third-Party Defendant).

Fourth District   No. 4—93—0366

Argued September 20, 1993.—Opinion filed October 28, 1993.

William A. Allison (argued), of Bloomington, for appellant.

Frederic L. Kenney (argued), of Winters, Prince, Featherstun, Johnson & Gaumer, of Decatur, for appellee.

JUSTICE LUND delivered the opinion of the court:

Plaintiff appeals an order of the circuit court of McLean County granting summary judgment in favor of defendant on claims based upon common law negligence and the Structural Work Act (Act) (Ill. Rev. Stat. 1991, ch. 48, par. 59.90 *et seq.*). Plaintiff was injured while employed on a construction site. His employer N.E. Finch Company (Finch) was a subcontractor hired by defendant West Construction

Company (West). On April 2, 1990, plaintiff was injured on the jobsite while unloading "H-beams" from a flatbed truck.

Plaintiff alleged that West, as general contractor, was under a duty to use due care for plaintiff's safety. This duty was allegedly breached when defendant (a) failed to provide a safe place for plaintiff to do his work; (b) allowed steel beams to be stacked on the truck in an unsafe fashion, so that when one of the beams was removed, other beams would fall on persons engaged in removing the beams; and (c) caused the beams to be stacked in such a fashion that they were prone to fall and injure plaintiff. The trial court found that West was not in charge of the work at the site where plaintiff was injured and granted summary judgment on both counts of plaintiff's complaint. We affirm.

### COMMON LAW NEGLIGENCE

■ To state a cause of action for negligence, one must allege a duty, breach of that duty, and a compensable injury proximately caused by that breach. (*Niemann v. Vermilion County Housing Authority* (1981), 101 Ill. App. 3d 735, 737, 428 N.E.2d 706, 708.) In order to establish that West owed a duty to Finch's employees, plaintiff relies upon the concept of "retained control," based upon section 414 of Restatement (Second) of Torts, which states:

"Negligence in Exercising Control Retained by Employer[.]

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." (Restatement (Second) of Torts §414, at 387 (1965) (hereinafter Restatement).)

Section 414 has been recognized as an expression of law in Illinois in *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 325, 211 N.E.2d 247, 252-53.

Comment *b* to section 414 states:

"The rule stated in this Section is usually *** applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so

done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself." (Restatement (Second) of Torts §414, Comment *b*, at 387-88 (1965).)

However, comment *c* to section 414 states:

"In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts §414, Comment *c*, at 388 (1965).

West contracted with the State of Illinois (State) to construct three bridges in McLean County. West subcontracted with Finch to perform the pile-driving work. At each of the three bridge sites, West performed excavation work in order to prepare the site for the pile-driving work. Then, according to recognized safety practices within the bridge-building industry, West vacated the site and notified Finch to begin the pile-driving work. West did not provide any equipment, manpower, or supervision to the Finch crew and did not observe or receive any notice of the manner in which the H-beams would be loaded, delivered, or unloaded.

The H-beams were picked up from the fabrication company by a Finch truck and delivered to the work site, where a Finch crew began unloading them with a crane owned and operated by Finch. The beams were stacked in two rows on the flatbed truck, with the beams in the "H" position. The beams on the second row overlapped those underneath. Plaintiff and a co-worker attached "alligator claws" to the ends of each beam, and the crane lifted the beams off the truck. At some point during this unloading process, a beam still on the truck rolled over onto plaintiff's foot.

Robert Schaeffer, superintendent for West, was in charge of coordinating the work of the subcontractors. He made one or two visits each day to check the progress at the bridge where plaintiff was working. He was there briefly on the morning of the accident, but did not witness the H-beams being unloaded or the accident itself.

The trial court considered the affidavit of Schaeffer in ruling on the motion for summary judgment, which states in part:

"Neither I, nor any employee or officer of West Construction Company exercised any direct, or indirect, control over the work assigned to, performed by or any activities of either Jimmie Rogers or any employees or officers of N.E. Finch and Company.

Over the past five (5) years I can attest that there have been at least fourteen (14) bridge projects which involved nearly identical procedures and arrangements. Once a job is secured then a purchase order is issued to N.E. Finch and Company for their portion of the job. With rare exception, N.E. Finch and Company is the first crew on the site to initiate work. Due to the nature of the work, West Construction Company refrains from having any personnel or employees, as well as any other sub-contractors who may be involved, on the site. N.E. Finch and Company would complete their tasks and vacate the site. They would then serve notice of their completion of their portion, usually by phone, and only then would other workers proceed onto the site.

West Construction Company relied on the [professional] expertise and experiences of N.E. Finch and Company and did not then, nor in the past, ever exercise any control over the manner in which their work was accomplished. N.E. Finch and Company had unrestricted control over their supervisors, employees, materials, equipment and/or apparatus.

*** Prior to, and during, the work activities undertaken by N.E. Finch and Company were conceived, directed and completed with no input or control from an outside source, including West Construction Company. All work done by them and for them by their employees was solely and totally under express control of N.E. Finch and Company and their supervisory personnel concerning all procedures, materials and equipment utility."

The affidavit above must be compared to Schaeffer's deposition testimony, where he described how he visited the bridge site once or twice a day just to see what progress Finch was making. When asked if he had any responsibility for the three bridges, he replied that he was in charge of all three of them. He further stated:

"Q. [Plaintiff's attorney:] So would you have been the safety representative for West on this 165 project?
A. [Schaeffer:] Yes.

Q. If you saw a subcontractor, or any of his employees, doing something contrary to good safety practices, what would you have done?

A. You would stop them right there.

           * * *

Q. Were there times when you had discussions with them about the way they were doing the work?

A. Yes, about how they were going to proceed, yes.

Q. Can you remember any specifics on that?

A. Well, no. They just tell you what equipment they are going to use and how they were going to set it up and which pile they would drive first and where they would start and finish.

Q. And they look to you to say go ahead on that basis?

A. No, not necessarily. I leave that up to him. He just told me what he planned to do and if it was reasonable, why you let him go.

Q. On the other hand, you retained the right to veto that if you thought it should be?

A. Yes, if I thought it was wrong, yes.

Q. Either the order of the work or the way in which they planned to do it?

A. That's true.

Q. You retained the right to veto that?

A. Yes.

Q. And that applied to Finch or any other subcontractor?

A. That's right."

While the testimony quoted above indicates that Schaeffer retained at least some control over his subcontractors, defendant counters this suggestion with plaintiff's own testimony: he acknowledged that he took orders only from Finch employees and never saw anyone other than a Finch employee at the jobsite. To the best of his knowledge, no one at West provided any instruction as to the manner in which the H-beams were stacked on the flatbed. Deposition testimony of the Finch foreman, Denny Joe Morsch, leaves no doubt that West had virtually no role in the loading or unloading of the H-beams. When asked if West had any ability to control or direct him or his fellow Finch employees, he replied that it did not. He agreed that, based upon his experience, it was generally true that unloading of steel beams is conducted by the pile-driving subcontractor without supervision from the general contractor. He said this was the customary practice between Finch and West. He attributed plaintiff's injury to his failure to watch out for the lifted load and keep out of the way.

Another Finch foreman, Doug Wilson, testified at his deposition that West's only involvement with the pile-driving operation was to tell Finch when and where to start. He found nothing unusual about West's complete lack of involvement in the unloading of the H-beams. He considered it to be their customary business practice. Morton Simerson, heavy equipment supervisor for Finch, testified that the presence of any West personnel on a jobsite of this nature would provide no benefit whatsoever.

Plaintiff cites *Weber v. Northern Illinois Gas Co.* (1973), 10 Ill. App. 3d 625, 295 N.E.2d 41, for the principle that a contractor owes an independent contractor whom he employs a nondelegable duty to provide a safe place to work. The *Weber* case, like our own, was an action premised on both common-law negligence under section 414 of the Restatement and the Act. Plaintiff was an employee of a subcontractor working on a pipeline owned by defendant, Northern Illinois Gas (Northern). Northern maintained a construction inspector at the jobsite to oversee that the job was done properly. He was required to be on the site at all times that work was performed. Northern retained the power to forbid the work being done in a dangerous manner and had exercised this power.

The court concluded that Northern's supervisor had more power than to make only suggestions or recommendations and retained a right of supervision such that the subcontractor was not entirely free to do the work his own way. (*Weber*, 10 Ill. App. 3d at 639, 295 N.E.2d at 50.) Furthermore, this supervisor witnessed the subcontractor while he was engaged in unsafe work practices and yet did nothing to stop the activity. The court concluded a jury could find that Northern was in control of the work and reversed the trial court's order for summary judgment.

■ We find *Weber* distinguishable on its facts, which portray a superintendent much more actively involved than was the superintendent hired by West. The superintendent in *Weber* actively supervised all work done on the project and was present at all times. Furthermore, he witnessed the unsafe procedures, knew they were unsafe, and did nothing. Our review of the facts in this case reveals that pile driving is a highly specialized and dangerous activity requiring the absence of nonessential personnel at the work site. Schaeffer's responsibility was primarily focused on checking daily progress, not supervising the manner in which the work was done. Accordingly, we find no liability under section 414 of the Restatement.

Plaintiff proposes an entirely different theory for establishing defendant's duty to Finch, based upon the Illinois Department of

Transportation's Standard Specifications For Road and Bridge Construction (Standard Specifications). Plaintiff makes no attempt to explain the relevance of these Standard Specifications, but it can be presumed they are incorporated into every bridge construction contract issued through the Illinois Department of Transportation (IDOT). The Standard Specifications outline general requirements and covenants applicable to all highway improvements, as well as provisions relating to construction methods, equipment, and material on construction projects awarded by the IDOT. Plaintiff cites article 105.06 of the Standard Specifications, which provides, in pertinent part:

"The Contractor shall give the work the constant attention necessary to facilitate the progress thereof, and shall cooperate with the Engineer, appointed inspectors and other Contractors in every way possible.

The Contractor shall have on the work at all times, as the contractor's agent, a competent English-speaking superintendent capable of reading and thoroughly understanding the plans and Specifications and thoroughly experienced in the type of work being performed, who shall receive instructions from the Engineer or authorized representatives. The superintendent shall have full authority to execute orders or directions of the Engineer without delay, and to promptly supply such materials, equipment, tools, labor and incidentals as may be required. Such superintendence shall be furnished irrespective of the amount of work sublet." Standard Specifications, art. 105.06, at 21-22 (1981).

In addition, plaintiff cites article 108.01 of the Standard Specifications, which states that the contractor shall have a representative on the job at all times when either contract or subcontract work is being performed. (However, plaintiff does not cite where this may be found in materials in the record on appeal.) Finally, plaintiff cites article 507.08, which requires that before starting work the contractor shall inform the engineer of the proposed method of erection to be followed and the type equipment to be used. (Standard Specifications, art. 507.08, at 354 (1981).) This proposal is subject to the engineer's approval, and this approval shall not be considered as relieving the contractor of the responsibility for the safety of the contractor's method or equipment or from carrying out the work in full.

Plaintiff argues that West's retention of the authority to stop any work from being performed in an unsafe manner is in line with the dictates of its contract with the State, which warns that a State engineer's approval of work methods does not relieve the contractor of

the responsibility of the safety of the method. Furthermore, the fact that the contract required the presence of a West representative on the jobsite at all times reinforces the idea that defendant's duty to plaintiff was nondelegable. Merely because West ignored its contractual duty to supervise, plaintiff argues, does not detract from the fact that the duty exists.

■ We find the numerous and varied regulations contained in the Standard Specifications create a duty owed to the State, not the plaintiff. Government contracts, noted for their overwhelming array of specifications, cannot be read to establish beneficiary rights for nonparties to the agreement.

### STRUCTURAL WORK ACT

Sections 1 and 9 of the Act provide the basis for plaintiff's claim under the Act. The relevant parts of those sections follow:

> "All scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon." Ill. Rev. Stat. 1991, ch. 48, par. 60.

> "Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this Act, shall comply with all the terms thereof ***.
> * * *

> For any injury to person or property, occasioned by any wilful violations of this Act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby ***." Ill. Rev. Stat. 1991, ch. 48, par. 69.

Briefly, to establish a violation under the Act, plaintiff must prove the following: (1) plaintiff's injury arose from a scaffold, hoist, crane, stay, ladder, support, or other mechanical contrivance which was not erected and/or operated in a safe manner; (2) at the time of his injury,

plaintiff was involved in the erection, repairing, alteration, or removal of any building, bridge, or other structure; (3) West was in charge of the work; and (4) West willfully failed to comply with the Act. (Ill. Rev. Stat. 1991, ch. 48, pars. 60, 69.) Failure to produce evidence of one or more of the above elements would be grounds for summary judgment. *Carruthers v. B.C. Christopher & Co.* (1974), 57 Ill. 2d 376, 380, 313 N.E.2d 457, 459.

Whether a defendant was in "charge of" work under the Act is primarily a factual question involving numerous factors. (*Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444, 473 N.E.2d 946.) The supreme court in *Simmons* recognized a number of factors relevant to this determination: (1) supervision and control of the work; (2) retention of the right to supervise and control the work; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) responsibility for taking safety precautions at the jobsite; (6) authority to issue change orders; (7) right to stop the work; (8) ownership of the equipment at the jobsite; (9) defendant's familiarity with construction customs, and practices; and (10) whether defendant was in a position to assure worker safety or alleviate equipment deficiencies or improper work habits. *Simmons*, 104 Ill. 2d at 452, 473 N.E.2d at 949-50; *Chance v. City of Collinsville* (1983), 112 Ill. App. 3d 6, 11, 445 N.E.2d 39, 42.

First, we must determine whether the occurrence in question falls within the scope of the Act. The purpose of the Act is to provide protection to workers engaged in work activities of a particularly hazardous nature. While the Act is to be liberally construed to effectuate this purpose, it is not intended to cover any and all activities and hazards associated with construction activity. *Meyer v. Caterpillar Tractor Co.* (1990), 135 Ill. 2d 1, 7-8, 552 N.E.2d 719, 721.

In *Meyer*, the supreme court delivered a detailed analysis regarding the scope of the Act. In that case, plaintiff was injured while unbanding storage racks which would later be installed in the building. Each rack was 24 feet long by 40 inches deep and was left standing on the long, narrow edge of each bundle of racks. While standing on a curb near a bundle which was being unbanded, plaintiff heard a snap as the racks toppled over on their sides. The falling racks struck plaintiff and he sustained an injury to his knee. Plaintiff argued that a crane or forklift should have been used to support the bundle of racks during the unbanding process.

Initially, the *Meyer* court found that the Act applies to devices used to support materials as well as workers. Accordingly, the failure to use a forklift or crane in this case would be actionable under the

Act. However, the court next addressed whether the procedure of unbanding and unbundling the racks would have been "for the use in the erection, repairing, alteration, removal or painting" of any of the enumerated structures. The court found it was not, stating:

> "There are certain hazards present on structural work sites which are not unique to the construction industry. These hazards do not fall within the purview of the Structural Work Act merely by virtue of the fact that they are present on a structural work site. The Act simply does not authorize recovery for injuries from such hazards merely because they occur on a structural work site.
>
> ***
>
> The crane or forklift plaintiff claims should have been used to support the storage racks in the case before us would merely have supported the racks during the unbanding and unbundling process. This is not one of the activities specified in the Act, nor does it involve a hazard peculiar to structural work. Similar devices serve similar functions in a myriad of contexts other than structural work. ***
>
> A different result might well have been warranted here had plaintiff's injury resulted from the failure of a crane which was lifting the racks into position along the walls of the Caterpillar warehouse. Such activity is clearly within the purview of the Act." (*Meyer*, 135 Ill. 2d at 13-15, 552 N.E.2d at 724-25.)

We believe the *Meyer* decision leaves no doubt that the activity of unloading steel beams with a crane falls under the scope of the Act.

Defendant argues that before liability under the Act may attach, a defendant must be in charge of the particular operation which was a violation of the Act and caused the injury. The Act, defendant argues, is intended to cover those circumstances where the general contractor participates in the subject work or fails to oversee the work when the general contractor should have done so. The supreme court addressed the issue in *Larson* where the trial court, in its instructions to the jury, equated the term "having charge of" with retention of control and supervision. The supreme court found the instructions misstated the law and held:

> "The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. As was said of the word 'charge' in *People v. Gould*, 345 Ill. 288, 323: 'The word does not necessarily include custody, control or restraint, and its meaning must be determined by the associations and circumstances surrounding its

use. "To have charge of" does not necessarily imply more than to care for or to have the care of.' Thus, while the actual exercise of supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not necessary or conclusive factors, nor is either made a *sine qua non* for liability under the statute." *Larson*, 33 Ill. 2d at 321-22, 211 N.E.2d at 251.

The supreme court discussed the *Larson* decision in *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 119, 373 N.E.2d 1348, 1351, where the court remarked:

"It is clear from the [*Larson*] opinion that neither the exercise of supervision and control nor the retention of the right to do so 'are essential ingredients for having charge' (33 Ill. 2d 316, 322) and that the 'direct connection' with the work requisite to the imposition of liability may be proved by evidence of inspections or other activities and may also stem from the right to control the work whether or not that right is exercised. (33 Ill. 2d 316, 324.) The term 'direct connection,' like the term 'having charge of,' is one of common usage and understanding, and whether persons may be held to have a 'direct connection' with the work depends upon the circumstances of each case."

We believe the facts before the trial court establish that the particular nature of pile driving requires that it proceed under the exclusive control of the subcontractor. We view West's primary purpose as seeing that the project was completed on schedule and according to State specifications. Although West cannot abandon its concern for safety, the scope of this responsibility is not without limitation. As reflected in the *Weber* decision, if a West superintendent observes unsafe work practices, he or she is responsible for calling a halt to the unsafe activity. However, unlike *Weber*, where the general contractor was continuously present at the site, West's role in the pile-driving activity was, at best, peripheral. This is particularly true when applied to the specific activity that allegedly caused plaintiff's injury. No one has alleged, nor does it seem even remotely probable, that a general contractor would accompany a subcontractor to the fabrication plant to oversee the loading of H-beams. We have no evidence the West superintendent ever was, or even could have been, on notice of a dangerous condition. This is especially true since not one person among those individuals actually on site at the time of the unloading, includ-

ing plaintiff himself, found any error or negligence in the manner in which the H-beams were stacked.

Although mindful of the supreme court's broad interpretation of who may be said to be in charge of the work, it would be unreasonable to expect West to have supervised the loading of these beams or stepped in and stopped the activity of unloading them. We need not address the issues of whether there was a willful violation of the Act or whether the crane was operated in an unsafe manner. We hold that West was not in control of the work of unloading these beams.

Affirmed.

STEIGMANN, P.J., and GREEN, J., concur.