NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 241100-U

NO. 4-24-1100

IN THE APPELLATE COURT

FILED
November 27, 2024
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| SEAN GRAYSON, | ) | No. 24CF909 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan M. Cadagin, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court reversed the trial court's pretrial detention order and remanded for a hearing on conditions of pretrial release because the State failed to introduce clear and convincing evidence that no combination of conditions would mitigate any danger defendant posed to the community.

¶ 2    Law enforcement officers are entrusted with the responsibility of responding to dangerous situations for the protection of the public. Defendant Sean Grayson, a former Sangamon County sheriff's deputy, is alleged to have violated his duties in the gravest manner: he is alleged to have shot and murdered Sonya Massey during a visit to her home in response to a 911 call reporting that there was a prowler in her neighborhood. Whether defendant is guilty of these offenses and, if so, what punishment he will receive are questions that have not yet been resolved. The issue before the court is not defendant's guilt or innocence but whether he should be detained

prior to trial. Specifically, the question is whether the trial court erred in finding that the State proved by clear and convincing evidence that defendant "pose[s] a threat to the safety of individuals or to the community which no condition of release can dispel." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The trial court found that the State met its burden of proof; we hold that the court's finding was unsustainable on the evidence the State supplied. Accordingly, we reverse the court's detention order and remand for a hearing on conditions of pretrial release.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Pretrial Detention

¶ 5         The fundamental premise underlying pretrial detention based on the defendant's likelihood of future dangerousness is that it does not constitute punishment before trial. *Id.* at 746; see *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished."). Therefore, this severe restriction on the defendant's liberty must be justified not by the government's interest in *punishing* crime but by its interest in *preventing* crime by individuals the State can prove are dangerous. See *Salerno*, 481 U.S. at 749.

¶ 6                              B. Illinois Statutory Provisions

¶ 7         In Illinois, pretrial release is governed by article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2022)), as amended by Public Act 101-652 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act (Act). See *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting the stay of the Act's pretrial release provisions and setting their effective date as September 18, 2023). The Code provides that every defendant is eligible for pretrial release and presumed to be entitled to release on conditions imposed by the trial court, irrespective of the seriousness or the nature of the offense. 725 ILCS 5/110-2(a) (West 2022). The Code allows for the State to file a verified petition for a denial of pretrial release on the basis of either

dangerousness or flight risk. *Id.* § 110-6.1(a). In this case, the State has not alleged that defendant poses a flight risk, so we are concerned only with the dangerousness prong of the analysis.

¶ 8　　　　To detain a defendant on the basis of dangerousness, the trial court must find that the State has proven the following three elements: (1) "the proof is evident or the presumption great that the defendant has committed an offense" in a specific list of detention-eligible offenses, (2) "the defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case," and (3) "no condition or combination of conditions [of release] *** can mitigate *** the real and present threat to the safety of any person or persons or the community." *Id.* § 110-6.1(e)(1)-(3). Those conditions ordinarily include a requirement that the defendant "surrender all firearms in his or her possession to a law enforcement officer designated by the court" and may include home confinement with electronic location monitoring. *Id.* § 110-10(a)(5), (b)(5). The Code lists a number of specific conditions that the court may impose along with any "other reasonable conditions." *Id.* § 110-10(b). Although the Code provides nonexhaustive lists of factors for the trial court to consider (*id.* §§ 110-5(a), 110-6.1(g)), it emphasizes that "[d]ecisions regarding release, conditions of release, and detention prior to trial must be individualized, and no single factor or standard may be used exclusively to order detention" (*id.* § 110-6.1(f)(7)).

¶ 9　　　　The trial court makes its findings after conducting a detention hearing, at which the State and the defendant may present evidence on all three elements, including evidence "by way of proffer based upon reliable information." *Id.* § 110-6.1(f)(2). Those findings must be supported by clear and convincing evidence, which is defined as evidence that "produces the firm and abiding belief that it is highly probable that the proposition on which the [State] has the burden of proof is true." Illinois Pattern Jury Instructions, Criminal, No. 4.19 (approved July 28, 2023); see *Enbridge*

- 3 -

*Energy (Illinois), L.L.C. v. Kuerth*, 2016 IL App (4th) 150519, ¶ 134 (noting that this standard does "not quite approach[ ] the criminal standard of proof beyond a reasonable doubt").

¶ 10　　　　If the trial court finds that the State has failed to meet its burden of proof, the court must deny the State's petition and impose "the least restrictive conditions or combination of conditions necessary to reasonably ensure *** the safety of any other person or persons or the community." 725 ILCS 5/110-5(c) (West 2022). The State may file a second petition within 21 calendar days after the defendant is released (*id.* § 110-6.1(c)(1)), but "the State shall be required to present a verified application setting forth in detail any new facts not known or obtainable at the time of the filing of the previous petition" (*id.* § 110-6.1(d)(2)). Furthermore, "the defendant if previously released shall not be detained." *Id.* § 110-6.1(c)(1).

¶ 11　　　　　　　　　　　C. The Detention Hearing

¶ 12　　　　On July 17, 2024, defendant was indicted for first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2022)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), and official misconduct (*id.* § 33-3(a)(2)); all counts rested on the allegation that defendant, without lawful justification, discharged a firearm, striking Sonya Massey and causing her death.

¶ 13　　　　On July 18, 2024, the State filed a verified petition to deny defendant pretrial release, and the trial court held a detention hearing. Defendant stipulated that the State had satisfied the first element based on the first degree murder charge. See 725 ILCS 5/110-6.1(a)(1.5) (West 2022) (providing that first degree murder is a detention-eligible offense). Because our holding addresses only the sufficiency of possible conditions of release to mitigate any danger defendant may pose, we will address the question of justification as it pertains only to the second and third elements. See *People v. Romine*, 2024 IL App (4th) 240321, ¶¶ 14-15 (noting that lack of justification potentially implicates the first element, as well as the second and third elements).

- 4 -

¶ 14                    1. *Evidence at the Detention Hearing*

¶ 15        Prior to the detention hearing, the trial court reviewed "the recordings of body worn camera[s] depicting the events" and "a Use of Force Report from the Illinois State Police (ISP Report)" documenting the relevant events based on the body camera videos and reports submitted by the deputies. Pursuant to an agreed protective order, these materials were impounded—meaning sealed from public view. In addition to these materials, the court considered proffers by the attorneys for defendant and the State. The question in this case is whether the court's decision to grant the State's petition was reasonable based on this evidence. We note as well that the ultimate determination as to the truth of the allegations against defendant will be made based on the evidence admitted at his eventual trial.

¶ 16                    a. The Shooting

¶ 17        On July 6, 2024, at approximately 12:50 a.m., defendant and another Sangamon County sheriff's deputy were dispatched to Massey's home in response to her 911 call, in which she had reported that there was a prowler in her neighborhood. When the deputies arrived, they began searching around Massey's home for a prowler. Both deputies were wearing body cameras, but defendant's body camera was turned off. It is unclear whether the other deputy turned on his body camera immediately upon arrival, but the video in the record begins with the deputies entering Massey's backyard.

¶ 18        After several minutes of searching, the deputies did not find anyone, but they did notice that the car in Massey's driveway had two broken windows. The deputies knocked on the front door of the house, and Massey opened the door approximately four minutes later, apparently distraught and not thinking clearly. Massey had a slight build; defendant is approximately a foot

taller and significantly heavier. Defendant was armed with his service weapon, a 9-millimeter handgun.

¶ 19        After the deputies explained to Massey that they had not found anyone, defendant asked her, "Are you doing alright mentally?" Defendant asked her questions about the car in her driveway, which she said was not hers. The deputies followed her into her living room, where they attempted to obtain identification and asked about the damage to the car.

¶ 20        A row of floor cabinets approximately three feet high separated Massey's living room from her kitchen. In the kitchen, a pot of water was sitting on a gas stove. Having noticed that the gas burner was on, defendant gestured toward the stove and said, "We don't need a fire while we're here." Massey walked over, turned off the gas burner, carried the pot to the nearby sink, and turned on the faucet. The deputies both backed away into the living room. When Massey asked why, defendant responded that they were getting away from the hot, steaming water.

¶ 21        Massey twice said, "I rebuke you in the name of Jesus." In response, defendant said, "You better f*** not. I swear to God, I'll f*** shoot you right in your f*** face." Defendant then drew his service weapon and pointed it at Massey, repeatedly shouting, "Drop the f*** pot!" Massey said, "Okay, I'm sorry."

¶ 22        The subsequent events are not entirely visible in the body camera videos, but the ISP Report describes those events as follows:

> "Mrs. Massey flinched, let go of the pot, and then crouched below the line
> of the cabinets. [Defendant] continued to instruct Mrs. Massey to drop the pot as
> he approached Mrs. Massey with his service weapon still pointed in her direction.
> Mrs. Massey quickly stood up and grabbed the pot. As [defendant] continued to
> instruct Mrs. Massey to drop the pot and approached the cabinets, Mrs. Massey

- 6 -

threw the steaming hot water from the pot. While Mrs. Massey was throwing the water, [defendant] fired his weapon in the direction of Mrs. Massey. The water appeared to strike a chair next to the cabinets."

Defendant fired three times; one of the bullets struck Massey just below her left eye. She collapsed to the ground, lying on her left side, with the left side of her head against the floor.

¶ 23    Defendant reported the shooting to the police dispatch center and asked them to send emergency medical services (EMS). At that point, defendant activated his body camera, which made two beeps and began recording audio as well as video. We note that defendant's body camera video in the record begins exactly 30 seconds earlier, shortly before he drew his gun. However, the first 30-second portion of the video features no audio (as is the case with the other officer's video), possibly because it constituted "pre-event recording." See 50 ILCS 706/10-20(a)(1) (West 2022) (providing that body cameras generally "must be equipped with pre-event recording, capable of recording at least the 30 seconds prior to camera activation"). In response to defendant's action, the other deputy stated, "I was on, I was on," presumably referring to his own body camera, which had been activated earlier.

¶ 24    The other deputy said, "I'm going to go get my kit," presumably referring to a medical kit. Defendant responded, "You can go get it, but that was a headshot." Approximately 1 minute and 15 seconds later, defendant went to get the "med kit," saying "there's not much we can do." The other deputy said, "[W]e can at least try and hold the—stop the blood."

¶ 25    The other deputy took a dish towel from Massey's kitchen and held it against the bullet wound. Approximately 2 minutes and 20 seconds later, the other deputy asked defendant, "Do you still want me holding this pressure?" Defendant answered, "Yeah, EMS is coming." The other deputy continued to hold Massey's head and apply pressure to the wound for another four

minutes until EMS arrived. Despite these efforts, Massey ultimately died from the wound. During this time frame, defendant's body camera video shows him referring to Massey as a "f*** b***" and describing her as "crazy." Although defendant did retrieve a red duffel bag from the deputies' vehicle—presumably the medical kit he had gone to retrieve—neither deputy opened the kit nor used its contents to render aid to Massey.

¶ 26    On July 15, 2024, the Illinois State Police issued the ISP Report opining whether defendant's conduct was justified under the circumstances, applying standards established by United States Supreme Court caselaw regarding excessive force, Illinois statutes governing the use of force by peace officers, and Integrated Communications, Assessment and Tactics (ICAT) Law Enforcement De-Escalation Training, which the ISP Report endorsed. However, the ISP Report did not address events after the shooting, including the medical aid that was provided to Massey.

¶ 27    The ISP Report—which we mention here because the trial court considered the opinions it expressed in making the decision to detain defendant—stated, in pertinent part, as follows:

> "It is unknown if the Sangamon County Sheriff's Office has mandated this [ICAT] training to their Deputies. From the videos reviewed, the only tactics utilized during this incident were [defendant's] statement right after Mrs. Massey stated 'I rebuke you in the name of Jesus.' [Defendant] stated 'You better not. I will shoot you right in your [f***] face, Drop the pot.', drew his service weapon, and pointed it at Mrs. Massey."

¶ 28    The ISP Report concluded as follows:

> "After a careful review of the incident and weighing the incident against [*Graham v. Connor*, 490 U.S. 386 (1989)], Illinois Compiled Statutes, and ICAT

De-escalation training, the Officer Survival Section finds [the deputies] were justified in pointing their service weapons at Mrs. Massey in an attempt to gain compliance. [Defendant's] advancement and removing himself from the limited cover from Mrs. Massey and the distance the liquid could have been thrown, placed himself within a distance where he could have been injured. This is similar to an officer stepping in front of a moving vehicle and fearing for their safety. Because of [defendant's] advancement, [defendant] had no other option but to fire his duty weapon. Because [defendant] placed himself in danger of great bodily harm, the Officer Survival Section does not feel the shooting of Mrs. Massey [wa]s justified."

¶ 29        b. Defendant's Background and Proposed Conditions of Release

¶ 30        The State did not introduce any evidence as to whether defendant had a criminal history. Defendant's attorney proffered the following information about his background:

"You have before you a 30-year-old Defendant. He has owned his own home for the last four years. He lives there with his fiancée. They are set to be married in October.

[Defendant] graduated from North Mac in 2013 at which time he enrolled in the Army and was in the Army for three years before he was honorably discharged as a Private First Class.

His law enforcement career includes a year of service to Virden and Pawnee, another year of service to the community of Auburn, a year at the Logan County Sheriff's Department, and currently one-and-a-half years at the Sangamon County Sheriff's Office. That service ended yesterday [(July 17, 2024)] when Sheriff Campbell terminated him."

Defendant voluntarily surrendered himself to the Sangamon County jail less than a half hour after he was notified that he had been indicted in this case.

¶ 31        Defendant's attorney proposed release on the following conditions:

"That combination of conditions would be shall not possess any firearm or other dangerous weapons. Those have already been removed from his home. Shall not use any intoxicating or controlled substances, shall refrain from the use of alcohol, shall undergo a mental health evaluation and complete all treatment, sign any necessary releases so the pretrial services can confirm his compliance, and, lastly, submit to 24-hour seven-day a week electronic monitoring."

¶ 32        At the hearing, there was no discussion of the pretrial risk assessment that had been performed on defendant. Though the risk assessment scoresheet is not contained in the record, a later discussion between defense counsel and the trial court suggests that defendant received a score of 3 on a scale of 14 solely because the risk assessment provides that a felony charge is worth 3 points. According to the manual for interpreting the risk assessment, which is in the record, this score placed defendant in the second-lowest of six risk categories.

¶ 33                          2. *The Trial Court's Findings*

¶ 34        At the conclusion of the hearing, the trial court found that the State had met its burden of proof, granted the State's petition, and ordered defendant detained pending trial. The court summarized its findings on the second and third elements in a form detention order, shown here with the statutory factors in italics and the court's findings in ordinary type:

"*Nature and circumstances of the offense(s) charged.* Defendant was a sworn officer with training and was accompanied by another officer. Defendant was aware or should have been aware he was being video recorded. Despite these

- 10 -

safeguards and supervision from law enforcement, the Defendant still discharged his firearm against an unarmed woman. He was in violation of his oath as a sworn officer, which is evidence he is not a good candidate to be in compliance with his conditions. He directed law enforcement not to render aid, which is counter to basic norms of public safety. Defendant was not using his body camera until after the shooting. Not being in compliance with body camera requirements is further evidence that points to him not being able to comply with conditions. Defendant's characterizations of the victim after the shooting, as contained in the video in People's [Exhibit] A, are such a departure from the basic expectations of civil society that they are evidence of the Defendant's dangerousness and also that he could not comply with conditions.

\* \* \*

*The age and/or physical conditions of any victim of complaining witness.* The victim was a slight woman who weighed 110 lbs and was not a physical threat to the Defendant.

*Defendant is known to possess or have access to weapons.* A firearm was used in this case." (Emphases added.)

See 725 ILCS 5/110-6.1(g)(1), (6)-(7) (West 2022) (identifying these as factors for the court to consider).

¶ 35                                    D. The Follow-Up Hearing

¶ 36          Pursuant to Illinois Supreme Court Rule 604(h)(2) (eff. Apr. 15, 2024), defendant filed a motion with the trial court seeking relief from its order denying him pretrial release, arguing

that the court's findings on the third element were erroneous. The court denied the motion, reiterating its prior findings as follows:

"Electronic monitoring is insufficient. Electronic monitoring may detect a failure to comply with conditions, but it's not adequate to mitigate the threat.

In the video the impulsiveness of the defendant as demonstrated by the amount of time that passes from the gun being drawn to him firing the gun, electronic monitoring does nothing to mitigate that threat. The police officer standing right next to him and recording him could not mitigate that threat. Also, home confinement and turning in weapons are insufficient because the Court does not have confidence he could comply with conditions.

Evidence shows he didn't comply with his oath as an officer, he didn't comply with body camera requirements, and directed other officers to potentially not comply with their oaths as well. That is not mitigated by not being an officer. That is evidence that he does not comply with conditions of being an officer, it is evidence that he doesn't comply with conditions. The Court is unsatisfied that he would comply with conditions of home confinement or simply stating that he is going to turn over all his weapons."

¶ 37        For the first time, the trial court addressed defendant's relatively low score on the risk assessment, though it noted that his score would have been two points higher (*i.e.*, 5 out of 14) if two prior misdemeanor charges for driving under the influence had been factored into the risk assessment.

¶ 38        This appeal followed.

¶ 39                                II. ANALYSIS

- 12 -

¶ 40　　　　Defendant has elected to have his motion for relief to serve as his argument on appeal. See Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024). The State argues that defendant's motion is deficient in several respects and that it "simply raises factual issues that the trial court resolved in favor of the State." The State's argument on this point is not well taken; defendant's motion contains sufficient detail to enable meaningful appellate review (see *id.*), and that review extends to his allegations that the court's factual findings were erroneous (see *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001) ("[A]lthough determinations by the trier of fact are entitled to great deference, they are not conclusive.")).

¶ 41　　　　　　　　　　　　A. Standard of Review

¶ 42　　　　Definitive guidance from the supreme court on the appropriate standard of review is likely forthcoming, but we have explained at length why we review the trial court's decisions regarding pretrial release for an abuse of discretion. See generally *People v. Morgan*, 2024 IL App (4th) 240103, *argued*, No. 130626 (Ill. Sept. 12, 2024). " 'An abuse of discretion occurs when the [trial] court's decision is "arbitrary, fanciful or unreasonable," or where "no reasonable person would agree with the position adopted by the [trial] court." ' " *People v. Inman*, 2023 IL App (4th) 230864, ¶ 10 (quoting *People v. Simmons*, 2019 IL App (1st) 191253, ¶ 9, quoting *People v. Becker*, 239 Ill. 2d 215, 234 (2010)). "Although abuse-of-discretion review is the most deferential standard of review available," it does not constitute "mere rubber-stamping." *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 99 (2006). In the present case, we find that reversal is appropriate even under this deferential standard of review, so it would also be appropriate under any more exacting standard.

¶ 43　　　　Defendant argues that the trial court erred by finding that conditions of release, including not working as a law enforcement officer, home confinement, electronic location

monitoring, and the removal of firearms from his home, would be inadequate to mitigate the threat he posed to the safety of the community. See 725 ILCS 5/110-10(a)(5), (b)(5) (West 2022). Defendant does not directly challenge the court's finding that he poses a real and present threat to the safety of the community but that finding must still factor into our analysis because "dangerousness and conditions of release are two sides of the same coin; the nature and severity of the threat necessarily determine the nature and severity of the conditions that could—or could not—mitigate the threat." *Romine*, 2024 IL App (4th) 240321, ¶ 16; see *People v. Thomas*, 2024 IL App (4th) 240248, ¶ 26 ("[A]ny condition of release must be appropriately measured to meet the danger presented in each case.").

¶ 44                     B. Findings Not Supported by Evidence

¶ 45          " '[F]or a reviewing court to determine whether the trial court abused its discretion, it must undertake a review of the relevant evidence.' " *Morgan*, 2024 IL App (4th) 240103, ¶ 35 (quoting *People v. McDonald*, 2016 IL 118882, ¶ 32). Our review of the evidence here fails to turn up support for several of the trial court's findings; as such, the court's conclusion that the State supplied clear and convincing evidence to support these findings is necessarily unreasonable.

¶ 46                          1. *Defendant's Training*

¶ 47          Although the trial court emphasized that defendant was a trained officer who "ha[d] gone through personally hours of training," there is no evidence in the record concerning defendant's training or how it was violated. More importantly, the question before the trial court was whether there were adequate conditions to guard against any danger defendant would pose if he were released pending trial. Defendant's training may be an important issue at the eventual trial of the charges against him, but it bears little on this question.

¶ 48                          2. *Defendant's Oath*

¶ 49        The trial court emphasized that defendant violated his oath as a sworn officer. Irrespective of what obligations bound defendant while he was a sworn officer, however, the evidence showed that at the time of the hearing, defendant was no longer a law enforcement officer subject to any oath; there was no way, then, that he could violate those obligations again if released. Imposing pretrial detention solely for a past infraction when a similar infraction would be impossible on pretrial release crosses the line from permissible regulation of pretrial release to impermissible punishment.

¶ 50                            3. *"Basic Norms of Public Safety"*

¶ 51        In its detention order, the trial court found that defendant "directed law enforcement not to render aid, which is counter to basic norms of public safety." The record does show that the officers discussed whether any aid they could render with the medical kit would be futile in light of Massey's severe injury, but they also summoned EMS to provide aid, and defendant still retrieved the medical kit. But again, these matters do not reasonably bear on whether adequate release conditions could be fashioned to mitigate any danger defendant poses as a private citizen, not as a law enforcement officer. On pretrial release, defendant will not be able to issue directives to other law enforcement officers or fall short in providing assistance when acting in a law enforcement role.

¶ 52                            4. *Body Camera Requirements*

¶ 53        The trial court found that defendant failed to comply with statutory body camera requirements by activating the video immediately before the shooting and the audio immediately after the shooting. Presumably, the court was attempting to analogize defendant's compliance with body camera regulations and his possible future compliance with GPS monitoring if ordered by the court. This is a strained connection; if defendant is fitted with a GPS monitoring device, it will

not be up to him to activate it. See 730 ILCS 5/5-8A-4.15(b) (West 2022) (subjecting defendants on pretrial release to criminal penalties when they deactivate electronic monitoring devices). Therefore, this analogy provides little support for the court's conclusion that pretrial release conditions would be inadequate.

¶ 54       5. *"Supervision From Law Enforcement"*

¶ 55       The trial court described the other deputy's accompanying of defendant as "supervision from law enforcement." However, there is no indication that the other deputy had a supervisory role over defendant; indeed, the court seems to have believed that the opposite was true, faulting *defendant* for directing the *other deputy* not to render aid to Massey.

¶ 56       C. The Trial Court's Conclusions

¶ 57       To recap, the State introduced no evidence, much less clear and convincing evidence, of (1) the training that defendant is alleged to have clearly disregarded, (2) the provisions of the oath that defendant is alleged to have violated, or (3) the Sangamon County Sheriff's Office's policies that defendant is alleged to have deliberately disobeyed. Nevertheless, the trial court found clear and convincing evidence that defendant's unspecified noncompliance, together with his impulsiveness and disparagement of Massey, were such a "departure from the basic expectations of civil society" that no conditions of release would be adequate to mitigate the threat he posed to the safety of the community.

¶ 58       The trial court apparently drew this language from our decision in *Romine*, 2024 IL App (4th) 240321, ¶ 20, which defendant discussed at the detention hearing. There, we addressed the question of whether pretrial detention can be justified on dangerousness grounds for a first-time offender charged with a crime of violence. *Id.* ¶ 16. The allegations in *Romine* were that the defendant shot his mother, abandoned her body, falsely told the police that she was alive and well,

tried to destroy his cell phone, tried to elude the police by running red lights, threw a loaded AR-style rifle out of his car window, tried to ingest a large number of pills, and told the police that his mother had likely been killed by an attempted robber named "John." *Id.* ¶¶ 5-7. At the detention hearing, however, the defendant acknowledged that he did kill his mother but asserted that his use of force was justified, *i.e.*, that he acted in self-defense. *Id.* ¶ 13 (citing 720 ILCS 5/7-1(a) (West 2022)). In affirming the trial court's order on dangerousness grounds, we concluded that even charged conduct alone "may reflect such a departure from the basic expectations of civil society that it becomes difficult to predict the defendant's compliance with court orders." *Id.* ¶ 20.

¶ 59        We find *Romine* offers little support for the trial court's ruling here. Defendant is alleged to have breached his responsibilities as a police officer with terrible consequences; unlike in *Romine*, where the defendant's conduct extended over multiple days, the case on the merits against defendant here is focused on whether his reaction to a momentary situation was criminal. Thus, this case arises purely out of defendant's law enforcement role, but that circumstance no longer exists now that he has been discharged. See *People v. Russell*, 2023 IL App (4th) 230918-U, ¶ 18 (reversing a detention order for a defendant charged with causing the death of a child because conditions of release could prevent her from caring for another child and therefore "mitigate the general alleged threat to the community"). When the question before the court is whether defendant can be safely released prior to trial on appropriate conditions, it is inappropriate to dwell on whether he fell short of the high expectations society rightly has for its law enforcement officers. A defendant's conduct may be reprehensible and deserving of punishment, but that is an inappropriate basis for imposing pretrial detention. See *People v. Atterberry*, 2023 IL App (4th) 231028, ¶ 18 ("[T]he fact that a person is charged with a detainable offense is not enough to order detention, nor is it enough that the defendant poses a threat to public safety.").

¶ 60                                    D. Remand

¶ 61                              1. *Conditions of Release*

¶ 62        In previous appeals where the trial court's explanation behind its detention order

was insufficient, we have vacated the detention order and remanded for a new detention hearing,

at which the court could properly explain its decision. See, *e.g.*, *Atterberry*, 2023 IL App (4th)

231028, ¶ 21. Our reason is that the State should not be held responsible for the court's error when

the State supplied sufficient evidence at the first detention hearing. Here, however, the State failed

to supply sufficient evidence, so we hold the State responsible by reversing the court's detention

order outright and placing the parties in the same position they would have been had the court

properly denied the State's petition and proceeded to a hearing on conditions of release. Although

our order has addressed only the conditions of release addressed at the detention hearing, we

express no opinion as to what conditions of release may be appropriate on remand.

¶ 63                              2. *The Protective Order*

¶ 64        As noted above, the materials the trial court considered at the detention hearing

were impounded. When adopting the parties' agreed protective order, the court failed to explain

its reasoning for sealing these materials from public view. We recently cautioned that this practice

is improper:

            "[T]he public has a presumptive right of access to [court] records. *In re Marriage*

            *of Johnson*, 232 Ill. App. 3d 1068, 1074-75 (1992) ('The file of a court case is a

            public record to which the people and the press have a right of access. *** Once

            documents are subject to the right of access, only a compelling reason,

            accompanied by specific factual findings, can justify keeping them from public

            view.'). The record on appeal does not disclose why the records were sealed, so we

presume the trial court acted within its discretion in sealing them. See *Skolnick v. Altheimer & Gray*, 191 Ill. 2d 214, 231 (2000) (noting that the decision to seal court records is discretionary); *Bicek v. Quitter*, 38 Ill. App. 3d 1027, 1030 (1976) ('It is well settled that there is no presumption of abuse of discretion by a trial court ***.')." *Schultz v. Sinav Ltd.*, 2024 IL App (4th) 230366, ¶ 150.

The remedy we ordered in *Schultz* is appropriate here as well:

"[T]he trial court on remand must revisit whether the party or parties seeking to seal these documents have met the heavy burden necessary to warrant the continued restriction on public access; absent such a showing, the documents must be unsealed. See *Skolnick*, 191 Ill. 2d 214 (explaining what the party opposing public access must show); see also *Marriage of Johnson*, 232 Ill. App. 3d at 1075 ('The parties' desire and agreement that the court records were to be sealed falls far short of outweighing the public's right of access to the files.'). The parties' agreement on sealing cannot be the end of the trial court's scrutiny because the strong presumption in favor of open access cannot be so easily overcome. The court must satisfy itself that it has a proper basis for sealing and that the extent of the sealing goes no further than is necessary to serve the interest which justifies it, regardless of what the parties may agree to." *Id.* ¶ 151.

¶ 65    In the meantime, the exhibits impounded by the trial court "shall remain as such when filed in the reviewing courts" (Ill. S. Ct. R. 371 (eff. June 11, 2021)), and the name of the Sangamon County sheriff's deputy who accompanied defendant to Massey's house appears only in the impounded record. Our choice to avoid using his name in this order does not constitute a finding that his name should be withheld from public view; it means only that the trial court should

be given the first opportunity to make the necessary factual findings. *Johnson*, 232 Ill. App. 3d at 1074-75; see *Simmons v. Union Electric Co.*, 104 Ill. 2d 444, 463 (1984) (explaining that reviewing courts are not fact-finding tribunals).

¶ 66                                    III. CONCLUSION

¶ 67        We ask members of law enforcement to go into sometimes tense situations, but we do so with the expectation that they will conduct themselves in a way that makes our communities safer, not more dangerous. Whether defendant fell below these expectations to the point of criminality is a matter which will eventually be decided on the merits of this case. In considering whether defendant poses a danger justifying his pretrial detention in the interim, however, the question is not whether he will meet the high expectations of a law enforcement officer; the question is whether, as a private citizen, he poses a danger to the public that cannot be mitigated by appropriate conditions of pretrial release. The trial court's focus on defendant's failings as a law enforcement officer, while understandable, distracted from the central question of how to address any risk he posed after being stripped of his office.

¶ 68        For the reasons stated, we reverse the trial court's detention order and remand with directions for the court to promptly (1) set the case for a hearing to determine the least restrictive conditions of defendant's pretrial release pursuant to section 110-5 of the Code (725 ILCS 5/110-5) (West 2022)) and (2) revisit whether the party or parties seeking to impound the exhibits considered at the detention hearing have met the heavy burden necessary to warrant the continued restriction on public access to those exhibits.

¶ 69        Reversed and remanded with directions.