2025 IL App (2d) 250276-U
No. 2-25-0276
Order filed October 6, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No.  25-CF-440 |
| | ) | |
| | ) | Honorable |
| MICHAEL FARRIS, | ) | Salvatore LoPiccolo and |
| | ) | John A. Barsanti, |
| Defendant-Appellee. | ) | Judges, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justice Hutchinson concurred in the judgment.
Justice Birkett dissented.

**ORDER**

¶ 1    *Held*:  The trial court did not err in granting defendant's second motion for relief and ordering that defendant be released on conditions pending trial.

¶ 2    The State appeals from an order of the circuit court of Kane County granting the second motion for relief filed by defendant, Michael Farris, and ordering him released with conditions pending trial after having previously granted the State's verified petition to deny him pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art.

110 (West 2024)), as amended by Public Acts 101-652, § 10-255 (eff. Jan. 1, 2023) and 102-1104, § 70 (eff. Jan. 1, 2023) (we will refer to these public acts collectively as the "Acts").[1] On appeal, the State argues that the trial court erred in finding that there were less restrictive conditions available than detention to mitigate the real and present threat to the safety of any person or persons or the community based on the specific, articulable facts of the case. We affirm.

¶ 3                                    I. STATEMENT OF FACTS

¶ 4                                         A. Background

¶ 5      On February 25, 2025, defendant was charged by complaint with: (1) 67 counts of aggravated criminal sexual abuse (defendant more than 5 years older than victim) (720 ILCS 5/11-1.60(d) (West 2024)), a class 2 felony; (2) 3 counts of criminal sexual assault (victim is family member under the age of 18 years old) (720 ILCS 5/11-1.20(a)(3) (West 2024)), a class 1 felony; and (3) 20 counts of criminal sexual assault (supervisory role/victim over 13 years old but under 17 years old) (720 ILCS 5/11-1.20(a)(4) (West 2024)), a class 1 felony. The complaint alleged that defendant committed these acts on victims D.S., P.S., R.S., T.S., and Z.P. from 2008 until 2022. However, the individual counts do not allege any conduct after 2020.

¶ 6      On February 27, 2025, the State filed a verified petition to deny defendant pretrial release. In its petition, the State alleged that defendant was charged with detention-eligible offenses and he posed a real and present threat to the safety of any person or persons or the community. See 725 ILCS 5/110-6.1(a)(1) (West 2024).

---

[1] Public Act 101-652 (eff. Jan. 1, 2023), which amended article 110 of the Code, has been referred to as the "Pretrial Fairness Act" and the "Safety, Accountability, Fairness, and Equity-Today (SAFE-T) Act." However, neither title is official. *Rowe v. Raoul*, 2023 IL 129248, ¶ 4 n.1.

¶ 7     The State attached to its petition a sworn synopsis and an addendum to the synopsis drafted by the arresting agency in this case. The synopsis provides as follows. On October 17, 2022, Stephen S. and Kelly S., a married couple, contacted the Montgomery Police Department. Their son, P.S., reported that he had been sexually abused by defendant, his grandfather, between the years 2009 and 2022. P.S. was 20 years old at the time of reporting the abuse. P.S. told Stephen S. that while at defendant's residence, defendant would give P.S. alcohol and defendant would fondle P.S.'s genitals and force him to masturbate in front of defendant. P.S. also told Stephen S. that defendant would perform oral sex on P.S. This occurred every July when defendant's grandchildren would visit him for a week or two, unsupervised by other adults. During a July 2022, visit, defendant forced P.S.'s brother, N.S., to sit on defendant's lap.

¶ 8     On October 29, 2022, detectives spoke with D.S., P.S.'s brother and a grandchild of defendant. D.S. told detectives that when he was 10 years old, or around 2008, his relationship with defendant became "secretive." At that time, defendant began to have sexual encounters with D.S. These sexual encounters would occur when D.S. was visiting defendant in the summer and occurred one to two times a year. The encounters ended around 2016. D.S. stated that defendant would provide alcohol before requesting D.S. to join defendant in the basement, where defendant's bedroom was located. D.S. recounted multiple occasions where defendant attempted to stimulate D.S.'s genitals or where defendant would ask D.S. to rub defendant's shoulders while defendant masturbated.

¶ 9     On November 3, 2022, detectives spoke with P.S. P.S. stated that when he was about 10 years old, or around 2012, he began spending one or two weeks at defendant's house every summer. His brothers, D.S. and R.S., would be there as well. Defendant would have two beds set up in his living room, which resulted in one of the boys having to sleep in the basement with

defendant. P.S. recounted numerous occasions where defendant would fondle P.S.'s genitals and perform sexual acts on P.S. On one occasion, defendant performed oral sex on P.S. Further, P.S. stated that defendant admitted to P.S. that he had performed similar acts with D.S. and children that resided in defendant's neighborhood.

¶ 10    On November 9, 2022, detectives spoke with R.S. R.S. believed that defendant began asking him sexual questions when he was about 10 years old, or around 2013. Defendant would ask R.S. to undress and then perform sexual acts on him. R.S. recalled the last sexual act occurring around 2019 or 2020, when he was about 15 or 16 years old. R.S. recalled engaging in oral sex with defendant. Defendant disclosed to R.S. that he had engaged in similar acts with P.S. and D.S., leading R.S. to believe the behavior was acceptable.

¶ 11    Detectives later attempted to set up interviews with Stephen and Kathy's two minor children, N.S. and C.S. When defendant's name was mentioned, "both N.S. and C.S. showed 'visible physical reactions' and they 'completely shutdown [*sic*].' " During an interview on November 29, 2022, N.S. did not make any disclosure of sexual conduct with defendant.

¶ 12    Defendant was interviewed on January 20, 2023. Defendant stated that Stephen, his son-in-law, asked if sexual encounters had occurred between defendant and either P.S. or R.S. approximately four to five years prior. Defendant confessed that such encounters had occurred. Defendant believed that an incident occurred when R.S. and P.S. were about 12 to 14 years old. He stated that he been going through counseling and "had slipped." Defendant denied ever having sexual contact with D.S. Defendant also confessed to engaging in mutual masturbation with T.S., a neighbor, at a time when T.S. was approximately 15 years old. Defendant stated that T.S. had been shoveling snow for defendant.

¶ 13    After interviewing defendant, there was a lapse in time before any further action was taken in this matter. On December 6, 2024, P.S. called the police department, at which time the investigation resumed. Around this time, investigators also received an email from Kristen P.[2] , the spouse of defendant's son, K.F. The email from Kristen P. alleged that there were additional victims of defendant, including Z.P.

¶ 14    On December 10, 2024, detectives spoke with T.S. T.S. stated that he lived down the street from defendant growing up and that defendant sexually abused him when T.S. was about 15 or 16 years old.[3] The first sexual encounter between T.S. and defendant took place when T.S. offered to shovel snow for defendant. Defendant then invited T.S. into his home on multiple occasions and each performed oral sex on the other. T.S. stated that he received money from defendant. T.S. stated that the sexual encounters ended when he was 16 years old and began avoiding defendant.

¶ 15    On December 11, 2024, detectives interviewed Kristen P. Kristen stated that her husband had informed her that her nephew, Z.P., had been sexually abused by defendant. She also became aware that P.S., R.S., and D.S. had been sexually abused by defendant. After learning that these family members had been abused by defendant, her husband, K.F., admitted that he had been sexually abused by defendant as a child. K.F. described to Kristen various sexual acts performed on him by defendant but indicated that he did not want to cooperate with a police investigation. After K.F. described being sexually abused by defendant, Kristen P. contacted her nephew, Z.P., as he had stayed with P.S., R.S., and D.S. at defendant's home during the summer. Z.P. admitted one incident where a sexual act occurred with defendant.

---

[2]Kristen P. is elsewhere referred to as Kelly P. in the record. For the sake of consistency, we will refer to her as Kristen P., as this is the name provided in the officer's report based on the interview.

[3]The synopsis does not provide a date of birth for T.S., nor did T.S. state the year he was 15 years old. Based on the charging document, this would have occurred in 2007.

¶ 16    On December 13, 2024, detectives interviewed Z.P. Z.P. stated that when he was 16 or 17 years old, around 2017 or 2018, he was alone with defendant at defendant's home. Defendant provided Z.P. with alcohol and asked him to go into the basement. In the basement, defendant began masturbating and asked Z.P. if he could perform the same action on Z.P.  Z.P. agreed, explaining that "he felt like he was in a weird position, combined with the alcohol he was provided."

¶ 17    Detectives spoke with P.S. again on December 19, 2024. P.S. stated that he had his first sexual encounter with defendant when he was 10 or 11 years old, or around 2012 or 2013. P.S. recalled that he and defendant were in bed and defendant fondled P.S.'s genitals. P.S. pretended to be asleep. The next year, a similar incident occurred. P.S. pretended to be asleep, but defendant shook him awake and told P.S. to engage in sexual acts. P.S. complied. A year later, defendant performed oral sex on P.S. while P.S. pretended to be asleep. The following year, P.S. and defendant had another sexual encounter. After that instance, P.S. laid down and refused to roll over so that defendant could not engage in sexual acts. That was when P.S. was 14 years old. P.S. recalled that further incidents occurred between him and defendant from the time he was 10 to about 15 years old, or about 2012 to 2017.

¶ 18    Detectives spoke with R.S. again on January 3, 2025. R.S. stated that he was sexually abused by defendant when he was between the ages of 8 and 10 years old. He recalled that the sexual abuse would occur three to four times a year. Defendant would either masturbate in front of R.S. or ask R.S. to masturbate him. Defendant once coerced R.S. into performing oral sex on him.

¶ 19    Detectives spoke with D.S. again on January 6, 2025. D.S. stated that when he was a child he had been touched inappropriately by defendant. D.S. believed this began when he was 10 years

old, or around 2008. The sexual abuse lasted until he was about 18 years old, or in 2016. D.S. recalled that he received alcohol from defendant before defendant sexually abused him. Around the age of 16 years old, D.S. began to resist defendant's advances.

¶ 20    The police synopsis further noted that throughout the course of the investigation, defendant was involved in activities where children were present and sometimes left unattended with defendant. The activities included church outings, Boy Scouts, and a model train club.

¶ 21    An addendum to the synopsis provides as follows. On February 25, 2025, an arrest warrant was issued against defendant. On February 26, 2025, officers apprehended defendant. After transporting defendant to the police department, officers interviewed defendant. During the interview, defendant admitted to engaging in sexual acts with R.S. and P.S. when they were under 18 years old. Defendant also admitted to engaging in sexual acts with T.S. "multiple times a week for a year or two, when T.S. was under the age of 18." Defendant further admitted to engaging in sexual acts with Z.P. and K.F., as well as J.S., J.W., S.G., and M.D., previously unidentified victims.[4] He stated that the children upon whom he would perform sexual acts resided in the neighborhood, were friends of K.F., members of a train club, or associated with the Boy Scout group he joined as an adult leader. Defendant denied having sexual contact with D.S.

¶ 22                               B. Detention Hearing

¶ 23    Judge Salvatore LoPiccolo held a hearing on the State's petition on February 27, 2025. In support, the State presented the police synopsis and addendum. It also noted that defendant had no prior criminal history. The State then proceeded to argument.

---

[4]Although defendant admitted to engaging in sexual acts with K.F., J.S., J.W., S.G., and M.D., the complaint does not allege any acts against these victims.

¶ 24    In arguing that the proof is evident or presumption great that defendant committed the charged offenses, the State noted that defendant admitted to sexually abusing four out of the five charged victims in the case.

¶ 25    The State next argued that defendant poses a real and present threat to the safety of any person or persons or the community. The State asserted that defendant was interviewed subsequent to his arrest and told officers that the children that he had sexually abused lived in his neighborhood, were friends of family, or were members of his train club or the Boy Scout group for which he was an adult leader. It further pointed to the fact that one of defendant's victims, T.S., was going door to door offering to shovel driveways and defendant "took advantage of that situation and got that victim into his home." Thus, the State argued that no conditions could mitigate the real and present threat posed by defendant's release, because even if he were released with conditions, "there's no protections for the community that someone is not going to come to his home or he is going to be in a position where he has access to children in the community."

¶ 26    In response, defense counsel argued that the State failed to meet its burden by clear and convincing evidence that defendant poses a real and present threat to any person or persons based on specific articulable facts. Defense counsel noted that defendant is an 84-year-old man who lives alone. As of the date of the hearing, he had been "in counseling for the last 10 to 15 years where he's worked on the issues that have resulted in these charges to a point where he no longer feels that inclination." Additionally, defense counsel argues that defendant did not pose a real and present threat based on the length of the investigation. Specifically, the investigation began with interviews in 2022. Defendant was interviewed on January 20, 2023, but no further action was taken in the matter until one of the victims in the matter asked police for an update on December 6, 2024. Regarding dangerousness, defense counsel noted that defendant had no other criminal

history indicative of violent, abusive, or assaultive behavior. In addition, he no longer participated in any children's groups with his church and was no longer a Boy Scout leader. Further, his train club consisted of adults, but the club was going to disband the next month regardless. Finally, defense counsel asserted that defendant's age and health problems weighed in favor of granting pretrial release. Defendant takes several prescription drugs and has mobility issues. At the time of the hearing, defendant was confined to a wheelchair because of his mobility issues. Defendant also suffers from "constant pain in his hips and his back" and was scheduled to undergo hernia surgery. Defense counsel indicated that defendant experienced an injury due to his mobility problems where he was "unable to move for nearly 21 hours when [the] event happened, and his mobility is still impacted." Accordingly, defense counsel asked the trial court to find that there are conditions that could mitigate any danger defendant posed.

¶ 27    The trial court denied defendant pretrial release. In his oral findings, Judge LoPiccolo concluded that the State proved by clear and convincing evidence that the proof is evident or the presumption great that defendant committed the offenses charged. Initially, Judge LoPiccolo noted that "when there is a long time period between the offenses and the actual charges being brought, normally that's something [he] consider[s] in favor *** of the defendant." Here, however, while defendant did not have a prior criminal history, the sexual abuse in question was alleged to have occurred from 2008 to 2022. Judge LoPiccolo considered this to show a history of violent, abusive, or assaultive behavior, because the charged offenses are sex offenses. He also noted that defendant continued to commit the alleged offenses while attending counseling. Further, the State alleged that defendant's conduct occurred through 2022, when defendant would have been 82 years old. Judge LoPiccolo stated that while defendant is now confined to a wheelchair, "some of the acts that he committed and admitted to committing don't require mobility." Finally, "the fact that this

has gone on for as long as it did" led Judge LoPiccolo to conclude that defendant, even at his current age and physical condition, posed a real and present threat to the safety of any person or the community. Electronic Home Monitoring (EHM) would not sufficiently mitigate this risk, as it would not identify who was with defendant. Thus, there would not be any way to tell if defendant was complying with other conditions, such as no contact with anyone under the age of 18.

¶ 28                              C. Motions for Relief and Notice of Appeal

¶ 29    On March 10, 2025, defendant filed a "Motion for Relief Under the Pretrial Fairness Act." See Ill. S. Ct. R. 604(h)(2) (eff. Apr. 15, 2024). In the motion, defense counsel disputed the court's finding that defendant posed a real and present threat to the safety of any person or the community and that there were no conditions available that could mitigate the risk of any threat posed. Specifically, defense counsel pointed to defendant's ongoing health and mobility issues. Additionally, defense counsel noted that defendant had no prior criminal history and thus there was no reason for the court to conclude that he would not follow court ordered conditions of release.

¶ 30    On March 17, 2025, a hearing was held on defendant's motion for relief before Judge John A. Barsanti. At the hearing, defense counsel argued that although the complaint alleged conduct that ranged from 2007 to 2022, the State made no specific allegations past 2020. In that time, defendant's health had deteriorated. Defense counsel noted that defendant was confined to a wheelchair, was in the hospital after falling in his home, and was scheduled for hernia surgery. Further, in the time between the filing of defendant's motion for release and the hearing, defendant had a health emergency while in custody and had to be taken to the medical wing. Defense counsel stated that if defendant were released from custody pending trial, family members would be willing

to provide assistance. Finally, defense counsel noted that if defendant were to be placed on EHM, he would waive the requirement for two days of movement per week.

¶ 31    Judge Barsanti granted the motion for relief. In doing so, Judge Barsanti stated that he would release defendant on EHM with conditions, including a physical and psychological examination, a waiver of the two days of movement, and an agreement that defendant would allow Adult Court Services to look through his house. Additionally, defendant was not allowed to have any electronic devices.

¶ 32    On March 24, 2025, defendant's physical and psychological evaluation was filed in the trial court. The report noted that defendant was experiencing medical issues "including a hernia and frail core strength with difficulty getting around." Accordingly, an order was entered the same day granting defendant's pretrial release with the conditions articulated by Judge Barsanti on March 17, 2025. Upon being released with conditions, defense counsel noted that defendant's existing cell phone was a flip phone with no connection to the Internet.

¶ 33    On April 23, 2025, the charges against defendant were superseded by indictment. Defendant was charged with 65 counts of aggravated criminal sexual abuse (victim is a family member under 18 years old) (720 ILCS 5/11-1.60(b) (West 2024)), a class 2 felony; 41 counts of aggravated criminal sexual abuse (victim between 13 and 17 years old) (720 ILCS 5/11-1.60(d) (West 2024)), a class 2 felony; 20 counts of criminal sexual assault (position of trust, authority, or supervision) (720 ILCS 5/11-1.20(a)(4) (West 2024)), a class 1 felony; and 3 counts of criminal sexual assault (victim is a family member) (720 ILCS 5/110-1.20(a)(3) (West 2024)), a class 1 felony. The charges against defendant ranged in time from 2007 to 2020.

¶ 34    On April 24, 2025, the State filed a motion for relief. In its motion for relief, the State argued that there was clear and convincing evidence that defendant posed a real and present threat

to the safety of any person or the community and that no conditions could mitigate the threat posed by defendant's release. The State noted that at the hearing on its petition to deny defendant pretrial release, it presented evidence that one of the charged victims was lured into defendant's home, and that defendant had admitted to sexually abusing four of the five charged victims in the case. Additionally, the State contended that on March 24, 2025, the trial court released defendant with conditions "despite not having a physical and psychological evaluation," as it believed that the physical and psychological evaluation performed by the jail was insufficient to conform to the previous orders.

¶ 35    The matter proceeded to a hearing on the State's motion for relief before Judge Barsanti on May 1, 2025. At the hearing, the State provided no additional argument and rested on its April 24, 2025, motion for relief. Defense counsel argued that defendant had been released with conditions for over a month at the time of hearing. He had not violated the conditions of his relief in that time and had only left home for court dates. Additionally, defense counsel argued that while defendant did not receive a full physical or psychological examination, the report filed with the court was sufficient based on Judge Barsanti's statements at the March 17, 2025, hearing. The State acknowledged that defendant had provided the trial court with records from the Kane County Jail regarding his medical condition.

¶ 36    Judge Barsanti granted the State's motion for relief. In granting the motion, Judge Barsanti stated that "the factual information needed for detention[,] I believe for dangerousness[,] comes out of the details of the offense." He concluded that based on the "clear and convincing proof [defendant] committed these offenses" and posed a real and present threat to the safety of any person or persons or the community. As such, Judge Barsanti granted the State's motion for relief

and revoked defendant's pretrial release. Judge Barsanti added that although he was denying defendant pretrial release, defendant appeared to be frail.

¶ 37    Also on May 1, 2025, defendant filed a second motion for relief. In his second motion for relief, defendant alleged as follows. On March 17, 2025, after defense counsel presented evidence that he was in poor physical health and that the allegations against him were from years prior to the filing of the charges, Judge Barsanti "indicated he intended to release [d]efendant but wanted more information regarding [defendant's] medical and mental health situation." On March 24, 2025, after Judge Barsanti was provided defendant's jail medical records, Judge Barsanti granted defendant's motion for relief and released defendant with conditions. On April 24, 2025, the State filed its motion for relief. The State did not allege that defendant violated any conditions of his release. No new evidence was presented in the motion. Finally, on May 1, 2025, Judge Barsanti granted the State's motion for relief. He "did not explain the reasoning in revoking [d]efendant's pretrial release in light of over a month of compliance with every term of his conditions for release." Defendant stated that he had been checking in regularly with pretrial services, was in compliance with EHM, and had not been charged with any new offenses. Thus, defendant argued that the trial court had no basis to grant the State's motion for relief.

¶ 38    The matter proceeded to a hearing on defendant's second motion for relief before Judge Barsanti on May 7, 2025. At the outset, defense counsel outlined the brief history of the case as set forth in defendant's second motion for relief. In support of the motion, defense counsel argued that "what's typically expected of defendants is that if they are released on conditions, that that release is going to continue as long as they don't violate any of those conditions." Defendant was released, and in that time, he was compliant with all conditions of his release. Further, defense counsel asserted that none of the victims in this matter were currently under the age of 18, and

defendant does not have contact with those victims or any minors. Defense counsel reiterated that defendant is "obviously" frail, in a wheelchair, and has a number of medical issues.

¶ 39    In response, the State argued that it was improper to allege new facts in a motion for release, as defendant did. Additionally, the State emphasized that defendant could still pose a threat of harm to any person or the community when he was confined to his home, as one of his victims was a teenager going door to door shoveling snow.

¶ 40    Judge Barsanti granted defendant's second motion for relief and released defendant under the conditions previously set. In granting the second motion for relief, Judge Barsanti indicated that the point "which is most salient is that [defendant has] been out for an extended period of time with no problems, with no problems that have been tendered to this court." Although defendant's conduct happened for an extended period, the dates with specific allegations were from before 2020, which led Judge Barsanti to conclude that at the time defendant "might have been less frail," because he currently "does appear very frail."

¶ 41    On May 13, 2025, the State filed its second motion for relief. Beyond updating the timeline of events in this matter, the State's second motion for relief was substantially similar to the first motion for relief.

¶ 42    On June 26, 2025, the matter convened for a hearing before Judge Barsanti on the State's second motion for relief. The State provided no additional argument beyond what was alleged in the second motion for relief.  In response, defense counsel asserted that defendant had a number of medical appointments, including his scheduled surgery, in the coming weeks. Defense counsel noted that he was worried that if defendant were to be placed back in custody, his health would deteriorate further, as that is what happened on the occasions when defendant was previously placed back in custody. Judge Barsanti denied the State's second motion for relief.

¶ 43    On July 2, 2025, the State filed a notice of appeal. See Ill. S. Ct. R. 604(h)(3) (eff. Apr. 15, 2024) (providing that a party may initiate an appeal by filing a notice of appeal in the circuit court at any time prior to conviction). The State elected to file a memorandum under Illinois Supreme Court Rule 604(h)(7) (eff. Apr. 15, 2024). Defendant filed a response in opposition to the appeal.

¶ 44                                    II. ANALYSIS

¶ 45    Article 110 of the Code, as amended by the Acts, abolished traditional monetary bail in favor of pretrial release on personal recognizance or with conditions of release. 725 ILCS 5/110-1.5, 110-2(a) (West 2024). In Illinois, all persons charged with an offense are eligible for pretrial release irrespective of the seriousness or the nature of the offense. 725 ILCS 5/110-2(a), 110-6.1(e) (West 2024); *People v. Grayson*, 2024 IL App (4th) 241100-U, ¶ 7. To detain a defendant, the State has the burden to prove by clear and convincing evidence that the proof is evident or the presumption great that the defendant has committed a detainable offense (725 ILCS 5/110-6.1(e)(1) (West 2024)), that the defendant's pretrial release poses a real and present threat to the safety of any person or persons or the community based on the specific articulable facts of the case (725 ILCS 5/110-6.1(a)(1)-(7), (e)(2) (West 2024)) or a high likelihood of willful flight to avoid prosecution (725 ILCS 5/110-6.1(a)(8), (e)(3) (West 2024)), and that no condition or combination of conditions can mitigate the real and present threat to the safety of any person or the community or the risk of the defendant's willful flight (725 ILCS 5/110-6.1(e)(3) (West 2024)). "Evidence is clear and convincing if it leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Chaudhary v. Department of Human Services*, 2023 IL 127712, ¶ 74. The Code further requires that "[d]ecisions regarding release, conditions of release, and detention prior to trial must be individualized, and no single factor or standard may be used exclusively to order detention." 725 ILCS 5/110-6.1(f)(7) (West 2022).

¶ 46    In this case, no live testimony was presented. The parties proceeded solely by proffer. Although the trial court may have been in a better position to judge defendant's condition, as the record contains several observations of how "frail," defendant looked, neither party contests this observation nor contends that this requires us adopt a more deferential standard of review. Accordingly, our review of the trial court's factual findings and its detention orders is *de novo*. *People v. Morgan*, 2025 IL 130626, ¶ 54. Under *de novo* review, a reviewing court "perform[s] the same analysis that the trial [court] would perform using the proper standards." *People v. Ruhl*, 2021 IL App (2d) 200402, ¶ 69.

¶ 47    In its memorandum, the State argues that the trial court erred in finding that there were less restrictive conditions than detention available to mitigate the real and present threat posed by defendant's release. Section 6.1(e)(2)-(3) of the Act requires a court to find not only that the defendant subject to a detention petition "poses a real and present threat to the safety of any person or persons or the community" but that "no condition or combination of conditions" can mitigate that threat. 725 ILCS 5/110-6.1(e)(2)-(3) (West 2024). Although listed as separate findings in the statute, the two issues are inseparable. "[D]angerousness and conditions of release are two sides of the same coin; the nature and severity of the threat necessarily determine the nature and severity of the conditions that could—or could not—mitigate the threat." *People v. Romine*, 2024 IL App (4th) 240321, ¶ 16.

¶ 48    Under the Code, factors that a court may consider in making a determination of dangerousness, *i.e.*, that a defendant poses a real and present threat to any person or the community, include, but are not limited to: (1) the nature and circumstances of any offense charged, including whether the offense is a crime of violence, involved a weapon, or was a sex offense; (2) the history and characteristics of the defendant, including whether he or she has a prior criminal history

indicative of violent, abusive, or assaultive behavior; (3) the identity of any person to whom the defendant is believed to pose a threat and the nature of the threat; (4) any statements made by or attributed to the defendant, together with the circumstances surrounding the statements; (5) the age and physical condition of the defendant; (6) the age and physical condition of the victim or complaining witness; (7) whether the defendant is known to possess or have access to any weapons; (8) whether, at the time of the current offense or any other offense, the defendant was on probation, parole, or any other form of supervised release from custody; and (9) any other factors, including those in section 110-5 of the Code (725 ILCS 5/110-5 (West 2024)), the court deems to have a reasonable bearing on the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of such behavior. 725 ILCS 5/110-6.1(g) (West 2024).

¶ 49    Here, the synopsis indicates that the nature and circumstances of the charged offenses were sex offenses. 725 ILCS 5/110-6.1(g)(1) (West 2024). Defendant admitted to sexually abusing multiple children over the course of many years. While defendant did not have a criminal history, the sexual abuse he allegedly committed continued for over a decade at the least. 725 ILCS 5/110-6.1(g)(2) (West 2024). Further, defendant posed a risk to the community at large, as his victims included family, neighbors, and members of the social groups in which he participated. 725 ILCS 5/1100-6.1(g)(3) (West 2022). Despite these aggravating factors, defendant is in his 80s, and in very poor physical condition. 725 ILCS 5/110-6.1(g)(5) (West 2024). Defendant is in a wheelchair, suffers from back pain, and needs hernia surgery. According to defense counsel, when defendant was placed in custody, his health deteriorated even further. Additionally, because defendant has no prior convictions, he was never on any type of probation, parole, or other form of supervised release. 725 ILCS 5/110-6.1(g)(8) (West 2024).

¶ 50    In support of its contention that no conditions can mitigate the threat posed by defendant,

the State cites *People v. Schulz*, 2024 IL App (1st) 240422, for the proposition that conditions that keep a defendant at home, but do not control the conduct of the defendant while at home, are insufficient to mitigate the risk of harm posed by a defendant's release. In *Schulz*, the defendant was charged with possessing and reproducing child pornography. *Id*., ¶ 5. The defendant was 37 years old, had no prior criminal history, and did not have or reside with any children. *Id*., ¶ 8. There, the trial court granted the State's petition to deny defendant's pretrial release, finding that no conditions could mitigate the threat posed by defendant because "the safety risk to children is great." *Id*., ¶ 10. The reviewing court affirmed, finding that the defendant repeatedly victimized children "within the privacy and confines of his own home," and thus it was reasonable for the trial court to conclude that it could not "effectively impose a 'no access to the internet' condition," and "any situation that would not curtail his potential access to the Internet leaves a threat in place." *Id*., ¶¶ 30-31.

¶ 51    In response, defendant argues that the trial court correctly concluded that the conditions it imposed were sufficient to mitigate any threat posed by "the now-84-year-old, isolated, and ailing" defendant. He finds *Schulz* distinguishable, as there, the court was concerned with limiting defendant's ability to access the Internet. Here, in contrast, the court is tasked with limiting defendant's contacts with children. Defendant notes that while on pretrial release after his first motion for relief was granted, he was compliant with the conditions imposed. He contends that EHM and an order to have no contact with any individuals under the age of 18 is sufficient, as defendant, now in his 80s, has "significantly reduced opportunities and capacity for such crimes." He notes that the family members whose children he sexually abused "definitively cut him off, discontinuing visits in 2022 and reporting him to the police." Additionally, he no longer meets with his train club and ended his association with the Boy Scouts when he was in his 70s. Further,

he argues that his "increasing age is sharply limiting his mobility," as he no longer drives and has difficulty walking. Finally, defendant argues that he "will not have unsupervised proximity with a minor unless an unrelated minor fortuitously comes into his house—which the State proffered *has* happened once, in 2007 with T.S., but remains nonetheless a rare and low-likelihood scenario." (Emphasis in original.)

¶ 52    We agree with defendant. Under the Act, all persons are presumed eligible for pretrial release. 725 ILCS5/110-2 (West 2024). The question here is whether the State proved by clear and convincing evidence that there are no conditions or combination of conditions that could mitigate the risk posed by defendant's pretrial release. Here, defendant is not alleged to have committed any offenses since 2020. In the years since defendant has committed the offenses at issue, his health deteriorated and he is wheelchair bound, of limited mobility, suffering from several medical conditions, and requires surgery. Defense counsel asserted, and it was not contested, that while defendant was detained in this matter, he suffered a worsening of his health conditions. The court ordered conditions of release require defendant to remain at home seven days a week, submit to searches of his home by court services, have no electronic devices, and no contact with any minor or alleged victim. Defendant's contacts with the community have been severed, and EHM can ensure that defendant does not interact with children outside his home. We acknowledge that EHM cannot tell us who enters defendant's home. But the State points to only one instance when defendant invited a neighborhood child into his home, and that occurred nearly 20 years ago. Accordingly, it is unlikely that defendant poses a real and *present* threat of doing so again. See *People v. Smith*, 2025 IL App (4th) 241441-U, (finding that defendant was not a real and present threat where the allegations of predatory sexual assault were over 25 years ago and defendant had no other criminal history).

¶ 53    Finally, we find the State's reliance on *Schulz* to be misplaced. In *Schulz*, the trial court was concerned that it could not effectively impose a "no Internet" condition. *Schulz*, 2024 IL App (1st) 240422, ¶ 30. Here, defendant did not use the Internet to commit crimes, and there is no concern that defendant could access the Internet to commit new crimes. In any case, the trial court placed a condition that defendant have no access to electronic devices. The telephone he owned prior to arrest could not access the Internet, and there was no evidence that defendant was particularly tech-savvy. While both the defendant in *Schulz* and defendant here are alleged to have committed crimes in their home, the nature and the circumstances of each case differ greatly.

¶ 54    Hence, we conclude that the State did not meet its burden of proving by clear and convincing evidence that no condition or combination of conditions would mitigate the real and present threat defendant poses to his victims or the community.

¶ 55                                III. CONCLUSION

¶ 56    For the reasons set forth above, we affirm the judgment of the circuit court of Kane County.

¶ 57    Affirmed.

¶ 58    JUSTICE BIRKETT, dissenting:

¶ 59     I respectfully disagree with my colleagues' conclusion that conditions could mitigate the risk posed by defendant's pretrial release. As the majority recounts, the record demonstrates that defendant repeatedly exploited many opportunities to abuse multiple children, whether it be by embedding himself in settings where minors were present and unsupervised, through family, or by sheer happenstance, as when at least one victim, T.S., approached defendant's home to offer to shovel defendant's driveway. These facts do not only show defendant's access to victims in his community, but they also evince his opportunistic nature. The record further indicates that defendant successfully evaded detection for over a decade—possibly longer, considering the

allegations made concerning K.F.'s childhood. This, in turn, underscores defendant's persistence and his abilities to exploit others' trust in concealing his conduct, even while undergoing sex offender counseling.

¶ 60    Given his opportunistic nature and proven evasion skills, I do not believe that any combination of conditions—such as EHM or no-contact orders—could reasonably ensure the public's safety. To this point, the majority downplays the significance of T.S.'s abuse in particular—characterizing it is a single one-off event, unlikely to reoccur with other victims. Because the incident occurred over 20 years ago under somewhat unique circumstances, the majority concludes that it is not indicative of whether "defendant poses a real and *present* threat."

¶ 61    I disagree. The incident involving T.S. shows that any innocent, mundane interaction between defendant and a minor could result in the latter's abuse. Again, in T.S.'s case, all he had to do was knock on defendant's door to be invited in and subsequently abused. Because these types of chance encounters are an ordinary part of life in any residential neighborhood—whether as a result of children shoveling snow, selling candy, trick-or-treating, or offering to do yardwork—it is clear to me that defendant's presence in the community will continue to put children at risk. Although it is true that the incident with T.S. happened "nearly 20 years ago," it is clear from the record that defendant's abuse continued for years thereafter, undermining any claim that he no longer poses a threat. Indeed, as our supreme court has noted, the rate of recidivism amongst child molesters constitutes a "grave concern." *People v. Huddleston*, 212 Ill. 2d 107, 137 (2004). Further, age and frailty do not necessarily prevent a serial child sex offender—such as defendant, according to the State's proffer—from reoffending. See *People v. Taggert*, 233 Ill. App 3d 530, 560-61 (1992).

¶ 62   Because no conditions could truly isolate defendant from his immediately surrounding community or reliably prevent any contact with neighborhood children, I disagree that anything short of detention would suffice to protect the community from defendant.